ARKANSAS FOUNDRY COMPANY AND THE
TRAVELERS INS. CO. v. KATHERINE J. CODY
WIDOW OF WM. R. CODY, DECEASED

5-5623                           470 S.W. 2d 812

Opinion delivered September 27, 1971

*Terral, Rawlings, Matthews & Purtle,* for appellants.

*Stubblefield & Matthews,* for appellee.

FRANK HOLT, Justice. The appellee, Katherine Cody, widow of William R. Cody, instituted this action for workmen's compensation dependency benefits. The Workmen's Compensation Commission found, with one member dissenting, that Mr. Cody's death on July 10, 1969 was a result of the work he performed on July 3, 1969 and, therefore, arose out of and in the course of his employment.

For reversal of the circuit court's affirmance of the Commission's findings, appellants argue that there is no substantial evidence to sustain the findings of the Commission.

In July 1969 William Cody, 56 years of age, a three-year employee of Arkansas Foundry Company, was on vacation from his duties as a truck driver. He interrupted his vacation on July 3 to return to work for that day. He suffered a heart attack and died July 10, 1969. Mr. Cody's daily log for July 3 reflects that he was on duty from 6:30 a.m. until 8:30 p.m. During this time he drove his truck to Carlisle, Arkansas arriving around 10 a.m. and unloaded, without the assistance of the customary use of skids, 30 to 35 bundles of shingles weighing approximately 75 pounds each. Cody worked alone for an estimated 20 minutes before Mr. Milligan, the manager of Peterson's Farms, and his son-in-law arrived to assist in unloading the balance of the 120 bundles of shingles. The son-in-law and Cody carried the balance a distance of 15 to 18 feet to the rear of the enclosed van where Milligan stacked them on the ground nearby. Milligan testified that: July 3 was "one of the hottest days we had," the unloading was "extremely hard" work; after they completed the unloading, he and Cody "walked up in the shade and talked a little bit" and that Cody was sweating while working and "got plenty hot" but did not complain of having any pain. Milligan said that he and his son-in-law were so hot themselves that they did

not pursue their claim that they were 2 or 3 bundles "short."

After leaving Peterson's Farms, Cody drove to Brinkley and then to Memphis where his truck was reloaded and then he returned to Little Rock, arriving home around 9 o'clock. Mrs. Cody testified that when he arrived home his clothes were sweaty, his face was flushed, and he complained that he "got as hot as a firecracker down there" and that he just fell into his reclining chair and said that he was suffering pain in his left arm, under his shoulder blade and in his chest; that she rubbed him with Mentholatum Deep Heat; that he had refused to eat dinner; and that he had gone to bed on a rollaway bed in the dining room near the air conditioner. She further testified that it was unusual for him to complain when he came home from work and that this was the "first time he had ever complained with his arms;" that he did not want her to call the doctor and he did nothing but lay around the house on July 4, 5 and 6 which was unusual for Mr. Cody; that on Sunday, July 6, she took his temperature and it was 102 and that on the 7th she called Dr. Ross Bizzell, the family doctor, and was told to bring him in right away. Following this examination, Cody returned home and went back to bed. Thereafter, the only time he left the house was on July 9 when he drove his car to his employer's office, picked up his check and visited around there for about two hours. To some he appeared healthy and to others he appeared pale and made the complaint that he was not feeling well. One witness testified that Cody told him the doctor had "grounded" him. One of the employer's managers testified that Cody, who appeared pale, did not complain to him except to say: "I won't be able to pull the mountain run tomorrow, the doctor said I've got to rest," and said nothing further about returning to work. There was no evidence that Cody made any complaint to anyone except his wife and stepdaughter on the day of the alleged injury. According to Mrs. Cody, her husband had not suffered from heart disease previously and he had not reported to her that Dr. Bizzell told him: "I had a heart attack." She stated that he was concerned about the "split-up" be-

tween his stepdaughter and her husband. Cody's step-daughter corroborated her mother's testimony about Cody's appearance on July 3, his subsequent condition and activities. She said Cody told her he had a lot of trouble unloading at his stop in Carlisle and that his arms were hurting him. She then felt that he had suffered a heart attack because the pain in his arms and back were similar to that undergone by her father when he suffered a fatal heart attack. In reply to her insistence that he go to a doctor, Cody said there wasn't anything wrong with his "ticker." After seeing the doctor, Cody told her the doctor said that he had pleurisy.

Dr. Bizzell, with 23 years' experience as a physician, testified that Mr. Cody had been a patient of his for about four years and that prior to July 7, as far as he knew Cody was in excellent health; that Cody had visited his office on July 7th and had told him that: "[H]e had been unloading some heavy shingles and he had had a pain in his chest and down his arms and that he had * * * had to sit down and rest and a couple of fellows had come along and if it hadn't been for them he couldn't have finished unloading his truck." Dr. Bizzell testified that bronchitis could cause chest pain, however, he told Cody that "he was sure that he had suffered an anginal attack and that he should go to the hospital for some EKG's and further tests." Other than hospitalization, Dr. Bizzell suggested that Cody "go home and rest." Dr. Bizzell treated Cody for acute bronchitis, prescribing Declomicin and Emperin No. 3 and bed rest. A copy of Cody's patient record card dated 7-7-69 was made an exhibit to Dr. Bizzell's testimony and, as interpreted by him, it reads: "Acute Angina Blood pressure 124/70 pulse 90 temperature 102. Acute Bronchitis, forced to rest on job, given Declomicin."

As to causal connection between Cody's work and demise, Dr. Bizzell further testified:

"Well, I believe he was in an enclosed van and the temperature as I did recall—as I did write down that day, was 102 degrees outside. His information to me was that he was supposed to have helpers to

unload these and that he had an attack, was forced down, was forced to sit down and rest until some help did arrive. I do believe at this time, due to the circumstances, that certainly I believe it aggravated the—or set off the triggering motion of an anginal or a coronary syndrome. I believe this. * * * Well, as I said before, I believe this—his work, the stress and strain of lifting precipitated the angina attack which further led to a complete occlusion or an extensive thrombosis, later to his death on the 10th."

He also remarked that bronchitis was often observed in people who had suffered a sudden spasm of the heart. The death certificate shows the cause of death as coronary occlusion, with which Dr. Bizzell agreed.

The appellants presented medical evidence which included the written opinions of four physicians to a hypothetical question. Each of the four opinions negated a finding that there was a causal relationship between the work done by Cody on the third and his death on the tenth. However, the hypothetical question did not indicate that Dr. Bizzell had told Cody that he had suffered an angina attack or that Cody had worked alone for a period of time before help arrived, or that Cody did not work after July 3 until his death July 10. Even so, based upon the hypothetical question as presented, Dr. Kahn, one of these four physicians, stated in his report: "It is my belief that this individual sustained a heart attack while at work performing the usual tasks which truck drivers might do." Dr. Cullen, appellants' witness, testified at the hearing that: "If he had chest pains of the kind described on the job and so forth I would say, yes, there was a causal connection." Dr. Cullen also stated he could not categorically say there would not be a causal relationship between Cody's work in the absence of evidence of pain prior to his return home for the reason that, contrary to the usual course, there is a possibility of one's experiencing a "silent coronary," i. e., without a lot of symptoms at the start.

In reviewing the evidence in workmen's compensation cases we follow the substantial evidence rule. In

*Kearby* v. *Yarbrough Brothers Gin Co.,* 248 Ark. 1096, 455 S. W. 2d 912 (1970) we said:

> "\* \* \* This court has said on more than one occasion that the strongest rule in compensation cases, and the one carrying the greatest weight, is that if there is any substantial evidence to support the findings of the commission, we will not disturb those findings. *Reynolds Metal Co.* v. *Robbins,* 231 Ark. 158, 328 S. W. 2d 489 (1959)."

Further, in *Hall* v. *Pittman Construction Co.,* 235 Ark. 104, 357 S. W. 2d 263 (1962) we said:

> "Under the substantial evidence rule that prevails in a case of this kind the appellant shoulders a heavy burden in seeking a reversal of the commission's decision upon an issue of fact. In order to succeed the appellant must show that the proof is so nearly undisputed that fair-minded men could not reach the conclusion arrived at by the commission."

Undoubtedly we would affirm if the Commission's finding had denied benefits to Mrs. Cody. However, since the Commission resolved the contentions in favor of her, we cannot say that there is no substantial evidence to support the Commission's award. It is the exclusive function of the Commission to determine the credibility of witnesses and to reconcile any inconsistencies in their testimony in resolving factual issues.

Affirmed.