LEROY TIGUE *v.* CADDO MINERALS COMPANY
ET AL

5-6209 491 S.W. 2d 574

Opinion delivered March 5, 1973
[Rehearing denied April 9, 1973.]

*Hugh L. Brown,* for appellant.

*Wright, Lindsey & Jennings,* for appellees.

J. FRED JONES, Justice. This is an appeal by Leroy Tigue from a circuit court judgment affirming a denial by the Workmen's Compensation Commission of Mr. Tigue's claim for compensation benefits. The question before the Commission was whether Mr. Tigue's chronic diarrhea was the result of antibiotic medication he received in the course of surgery and treatment for a ruptured disc sustained in the course of his employment by the appellee-employer, Caddo Minerals Company. The ques-

tion before us on appeal is not whether there is substantial evidence in the record to sustain Mr. Tigue's claim; the question before us on this appeal is whether there is any substantial evidence to sustain the Commission's finding in favor of the employer. *Arkansas Foundry Co.* v. *Cody*, 251 Ark. 57, 470 S.W. 2d 812. In arriving at an answer to this question we must give the evidence its strongest probative force in favor of the Commission's findings. *Bentley* v. *Henderson*, 251 Ark. 203, 471 S.W. 2d 548.

The facts in this case appear as follows: In January, 1966, the appellant-claimant, Leroy Tigue, sustained a compensable injury resulting in the surgical removal of a ruptured disc. Mr. Tigue was given some antibiotics in connection with the disc surgery and within a few days after he was released from the hospital he developed a rather severe case of diarrhea. He attempted to control the diarrhea with Pepto-Bismol and other patent medicines and he was seen and treated for the condition by Dr. Jones, his hometown physician, for approximately two years. Following the onset of Mr. Tigue's diarrhea it was necessary for him to have another disc operation which was performed in December, 1967. The evidence indicates that the diarrhea would subside during periods of hospitalization or bed rest, but would recur at frequent intervals of from one to seven days duration when Mr. Tigue was up and about. The usual episodes were described as beginning about midmorning with intense abdominal pain followed by loosely formed or fluid bowel movements growing smaller and smaller in amounts and terminating in the passage of mucous which usually contained blood.

The issues before the Commission were apparently confined to whether of not Mr. Tigue's present diarrhea, which has become chronic, is a continuation of the diarrhea he suffered following his first disc operation and more particularly, whether the diarrhea was caused by the medication administered to him during the course of his disc operation. It was Mr. Tigue's theory and contention that the antibiotic therapy administered during the course of his disc surgery destroyed the normal bacteria in his intestinal tract resulting in the growth of yeast

and the chronic diarrhea. The Commission, in effect, found that Mr. Tigue had failed to prove that his chronic diarrhea was a result of his antibiotic therapy and his claim was denied.

Mr. Tigue testified that his diarrhea was at its worst stage when he first went to Dr. Garratt of Hot Springs in the spring of 1967; that his condition improved under the treatment of Dr. Garratt but then "just seemed to reach a standstill." He testified that he has experienced no improvement in the condition since sometime in 1968.

Two medical bills from Dr. W. J. Jones were introduced in evidence. One of them dated June 12, 1967, shows a diagnosis: "Diarrhea of undertermined etiology—Duration of 5 months." The subsequent bill dated August 14, 1968, indicates the same diagnosis and contains the statement: "This patient was referred to Dr. Burton for further treatment on the above diagnosis on March 1, 1967."

Apparently Mr. Tigue was seen and examined by Dr. Frank M. Burton of Hot Springs who in turn referred him to Dr. Charles E. Garratt. After a considerable period of treatment by Dr. Garratt, Mr. Tigue was referred back to Dr. Burton for additional examinations requiring hospitalization. There is no report or testimony from Dr. Burton as to his initial examination of Mr. Tigue, but in the October, 1971, deposition of Dr. Garratt he testified that he first saw Mr. Tigue March 8, 1967, upon referral from Dr. Burton, and at that time Dr. Burton reported he found no problem in the colon and that the stool showed only yeast cells.

Under date of May 13, 1967, Dr. Garratt reported to adjuster White as follows:

"X-ray examination of colon by Dr. Burton was reported to be negative and stool examination showed no parasites or ova of parasites. Yeast was found.

There was a history of a large amount of antibiotic therapy by mouth following surgery in another city

for a ruptured disc in the lumbar spine. Prior to this the bowel pattern had been normal.

He stated that he had a high fever for some days following surgery and presumably the antibiotics were used to combat infection.

Mr. Tigue is gradually improving, to the extent of going for several successive days without bowel disturbance. He has not completely recovered and comes to the office now about once a week.

He has been told the nature of his trouble which probably is the bacterial flora change subsequent to antibiotics."

Later, on March 18, 1968, Dr. Garratt reported to Mr. Tigue's attorney in part as follows:

"It is my opinion that Mr. Tigue's complaint originated from the use of antibiotics given following the original surgery on his lumbar spine. The condition which followed is an iritable colon manifested by attacks of frequent stooling with accompanying inflammation and tenderness of the membrane of the anal outlet. The chronicity of the annoying problems has tended to make the patient nervous, and often times, weak.

\* \* \*

The basic situation which was set up is an irritable colon. As a progress report, he has shown gradual improvement which has been interrupted at irregular intervals by acute attacks of diarrhea. These attacks have been of late less frequent and he has had relative freedom from the symptoms for periods as much as two consecutive weeks."

While in the Baptist Hospital in Little Rock from July 14, 1966, through July 23, 1966, Panalba, an antibiotic, was given to Mr. Tigue on July 18 and the same medication was continued for three days. It was discontinued on July 21.

The deposition of Dr. Garratt was introduced into evidence. He testified that the only abnormalities in Dr. Burton's findings, as reported to him, were watery stool and blood and yeast cells. Dr. Garratt then testified as follows:

"Q. I beleive you did mention that yeast was found in examination?

A. That's right.

Q. What is the significance—

A. * * * yeast is a secondary invader and comes at, oftentimes when the normal bacteria in the intestine have been killed or depleted, the yeast begins to grow in abnormal amounts.

Q. Was there an abnormal amount of yeast found on this examination?

A. Dr. Burton didn't say. He just said yeast cells.

Q. Would you normally expect to find some yeast cells?

A. As a rule, not enough for comment unless they were in excess. You wouldn't comment on them unless they are in excess.

Q. You assume there was some unusual level of yeast cells at the time of the examination?

A. That's right.

Q. All right, sir. Did you conduct any other type of examination, make any other findings which are noted in your records?

A. You mean of this initial—

Q. * * * on the initial examination.

A. No, sir.

Q. All right, sir. Did you come to any conclusion at that time what the cause of Mr. Tigue's problem was, his diarrhea?

A. Taking into account the laboratory work which had been done I based my conclusion on the fact that his antibiotics had destroyed the normal flora of bacteria in the bowel and produced dysentery or diarrhea.

Q. What are some of the other possible causes of diarrhea, of chronic diarrhea such as Mr. Tigue was experiencing?

A. Tumor, parasites, laxatives, irritants, that may be taken by mouth. That pretty well covers it.

Q. Irritants which may be taken by mouth?

A. That would be in the form of irritant laxatives.

Q. What about nerves, muscular problems, can that sometimes cause diarrhea?

A. Yes.

Q. Now, is there any way, Doctor, to positively determine that the normal flora or balance in the intestine has been upset by antibiotic therapy?

A. I do not know of one. It's an assumption to some extent but all of us have seen it so frequently that we look for it when patients develop a diarrhea during antibiotic therapy."

Dr. Garratt testified that he had treated other patients suffering chronic diarrhea as a result of antibiotic therapy and that "all of them either responded and overcame the problem in a shorter time than Mr. Tigue or else some other problem was found to be the background of the trouble." He testified that Mr. Tigue's case was definitely unusual in that it was of much longer duration that he had ever seen. Dr. Garratt then testified that the

antibiotic drug "Lincocin" is an antibiotic having tremendous power to kill bacteria and unfortunately that type of medication kills the favorable as well as the unfavorable bacteria. He testified that the bacteria in some people might be highly sensitive to antibiotics and in others not so sensitive, and that the quantity of antibiotics necessary to kill the bacteria differs tremendously with individuals. Dr. Garratt then testified as follows:

"Q. All right, sir. Doctor, in those cases which, in your experience you have dealt with chronic diarrhea resulting apparently from antibiotic therapy and where no other contributing cause was found can you tell us what the average time of recovery is excluding Mr. Tigue's case?

A. Yes. His case is unique. It might be anywhere from three weeks to three months.

Q. But three months in your experience pretty much would have been a maximum?

A. That's right, have been a maximum."

On cross-examination Dr. Garratt testified that Mr. Tigue was referred to him by Dr. Burton and that he did not duplicate the examinations done by Dr. Burton because of expense. He testified that he did a direct inspection of the bowels through a "hollow tube" and also a digital examination. He testified that both of these examinations were negative except for a "spastic type bowel." He said instead of remaining soft the bowel would have a tendency to close. Dr. Garratt then testified that he advised Mr. Tigue as to diet and suggested things that might put bacteria back into his bowels, such as churned buttermilk or cultured buttermilk and a tablet called Lactinex, which is acidophilus itself. He then testified as follows:

"Q. Now, there was some discussion a moment ago about motility of the muscles, is that correct?

A. Yes (witness indicating by nod of head.)

Q. And that is, seemed to be an increase, do you know what would cause such an increase, what could cause it?

A. Yes, any irritation that produces increase and also certain nervous factors can produce increase. Shock can. Pain or any number of factors can produce increased motility while the principal ones would be some irritation to the membrane in the colon."

Dr. Garratt was then asked whether or not the increased motility of the muscles in the bowel showed a big problem in the condition he observed in Mr. Tigue and he answered as follows:

"Yes, I think it did. I think that was really the background, whatever the reason was, the increased motility made the bowels move too much."

Dr. Garrett was then asked questions and answered them as follows:

"Q. Doctor, talking about the use of antibiotics sometimes a disruption of normal bacteria balance certain drugs somewhat restore the balance, do any laboratory tests reflect whether the balance has been restored or is there any way of telling this other than by observation of symptoms?

A. Yes, there would be. If he went through a more or less a research type institution like might be at the University of Arkansas Medical School where they would make specific cultures for these particular bacteria.

Q. But routine laboratory tests would not reflect these?

A. No, the one in St. Vincent and the one in St. Joseph's and the ones in our medical offices they wouldn't.

* * *

Q. Since we don't have any specific diagnostic tools at hand to determine the balance of the bacterial balance in the intestines can you with reasonable medical certainty say whether disruption of the bacterial balance was disrupting the balance as opposed to anxiety and nervousness resulting from his financial and general physical condition?

A. No, sir.

Q. Other than by his history?

A. I couldn't with accuracy."

On redirect examination Dr. Garratt testified that he had given a lot of thought to the question of whether or not Mr. Tigue's diarrhea could have been caused by anxiety and he testified that he gave Mr. Tigue tranquilizers to calm him but the diarrhea still persisted and that was the reason he "stuck to his guns" on the bacteria depletion theory. He testified that he could not honestly say how much of a factor the anxiety played in the condition as opposed to bacterial deficiency. He testified that in his opinion it could be easily one or the other or a combination of both. Dr. Garratt testified that Mr. Tigue was still having diarrhea when he stopped treating him in March, 1970, and in this connection he stated:

"When I quit treating him he was still having diarrhea and I contacted Dr. Burton and suggested that he see him with the idea of checking him over independently and he put him in St. Joseph's to do colon x-ray and to do Proctoscopic examination and various things and then Mr. Tigue I saw him in St. Joseph's on a friendly basis while he was in there under Dr. Burton and the diarrhea had stopped then. What happened later I don't know."

Dr. Garratt then again recommended a clinical work-up on Mr. Tigue's condition and stated:

"It would be a fine thing for him and that could be possibly done at the University of Arkansas through

the diagnostic set-up or Barnes Hospital, in St. Louis, or Ochner at New Orleans, and they would have men who would do this, especially a teaching institution where they would go down to the very bottom and determine the background."

He then testified that if Mr. Tigue was still having the same trouble, his only suggestion would be that he be sent to some medical center and "treated—not treated but examined by a Gastroenterologist to go through him completely and also whatever consultation they want, so on. I would suggest that that be done."

Apparently Mr. Tigue did return to Dr. Burton as directed by Dr. Garratt. As already stated, there is no report or testimony in the record from Dr. Burton but records from St. Joseph Hospital in Hot Springs were introduced into evidence which show that Mr. Tigue was admitted to the hospital on March 5, 1970, with Dr. Frank M. Burton as attending physician, and that he was discharged from the hospital on March 12, 1970. As a final diagnosis on the hospital record, signed by Dr. Burton, is the statement: "No disease found." The discharge summary, apparently in the handwriting and over the signature of Dr. Burton, contains the following statement:

"Patient admitted with complaint of recurring diarrhea for over two years. No diarrhea during this 7 day stay in hospital. All x-rays negative. There may be certain foods that cause the diarrhea and patient was discharged with instructions to keep accurate record of foods taken and the occurrence of diarrhea in an effort to find the offending foods—to see Dr. Garratt."

Mr. Tigue also underwent examination at the Little Rock Diagnostic Clinic and under date of December 20, 1971, in a letter-report to the attorneys for the workmen's compensation carrier, Dr. James H. Abraham reported as follows:

"Enclosed you will find a copy of my narrative summary concerning my work-up on Mr. Tigue. You will notice that my final impression is that Mr. Tigue has spastic, or irritable colon syndrome.

I have reviewed the records you enclosed, and the deposition obtained from Dr. Charles E. Garratt, dated October 14, 1971.

With regard to the question you asked in your letter of November 2, 1971, let me just say that in my opinion the chronic diarrhea that he suffers from at the present time is probably unrelated to the diarrhea that developed after his discharge from the hospital. It may have been that the diarrhea at that time may have been initiated by antibiotic therapy, however, it is not possible that that is still a causative factor. We have cultured Mr. Tigue's stool, found an abundance of normal organisms, so that the previous questions concerning overgrowth of yeast in the stool is no longer important.

I repeated the x-ray studies I thought necessary to confirm my impression about Mr. Tigue's case, and they were all normal. I sigmoidoscoped Mr. Tigue, and found the rectal membrane to be healthy in appearance. A tiny biopsy was made of the rectal mucosa, and the pathologist report is of non specific chronic inflammation. This is not to be construed as indicating that Mr. Tigue has 'chronic colitis.' I believe this to be a non specific finding.

Mr. Tigue's problem is certainly a troublesome one. It apparently has resisted all attempts to cure it. I am afraid he is stuck with it."

In the narrative summary of the work-up done at the clinic under "Past History" is a statement as follows:

"Drug reactions 1965—penicillin caused rash, fever, and joint swelling, he has no other drug reactions to his knowledge."

Except for carious teeth and ichthyosis of the skin, the remainder of the clinical examination was reported as normal.

Both sides recognize that Mr. Tigue had the burden of proving before the Commission that his chronic diarr-

hea was connected with his occupational back injury and more specifically that it was caused by the antibiotic therapy administered him in 1966. Both sides also recognize that on this appeal, the burden rests on Mr. Tigue to show that there is no substantial evidence to support the findings of the Commission. Substantial evidence has been defined as "evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences." Wigmore on Evidence, vol. IX, 3rd ed., § 2494, p. 300, footnote 18.

Apparently when Dr. Garratt learned from Dr. Burton upon initial examination of Mr. Tigue in March, 1967, that yeast cells were contained in Mr. Tigue's stool, Dr. Garratt concluded that beneficial bacteria were depleted or absent and with a history from Mr. Tigue of antibiotic therapy, Dr. Garrett concluded that the diarrhea experienced by Mr. Tigue was precipitated by the destruction of normal bacteria followed by the growth of yeast in the colon and the intestinal tract. Dr. Garratt was far from positive as to the accuracy of his initial diagnosis and certainly he appeared mystified by the duration of Mr. Tigue's malady. He readily recognized many things and combination of things other than bacterial deficiency that could be the cause of Mr. Tigue's colon irritation and resulting diarrhea.

The Commission may have noted that Dr. Garratt obtained his information as to the presence of yeast cells from a report he received from Dr. Burton in 1967 and that in the examination conducted by Dr. Burton as reported on the hospital chart in March, 1970, he made no mention of yeast cells, but did indicate the possibility of diet as a causative factor. Apparently Mr. Tigue's condition remained practically the same from the time Dr. Garratt last saw him in March, 1970, until he was examined by Dr. Abraham at the Diagnostic Clinic about November 8, 1971. Dr. Abraham found, through the only cultural process conducted, that the bacteria count was normal and that the yeast was no longer important. If the bacteria

count was subnormal when the presence of yeast was found by Dr. Burton and reported to Dr. Garratt in 1967, the record is silent as to what point in time the bacteria count returned to normal. There is evidence that Mr. Tigue's diarrhea was associated with blood in the stool and violent cramping and muscle motility in the intestinal tract but other than diarrhea for a maximum period of three months, there is no evidence in the record as to what symptons would normally follow the absence of bacteria and presence of yeast in the intestinal tract. There is no direct evidence that bacterial deficiency and the presence of yeast would cause chronic irritation of the colon, but there is evidence that irritation of the colon, regardless of the cause, will result in diarrhea and that many things, other than the absence of bacteria and presence of yeast, would result in such irritation and such symptoms.

We are unable to say that there is no substantial evidence in the record to support the Commission's finding that Mr. Tigue's spastic colon syndrome and chronic diarrhea are not a result of the antibiotic therapy administered to him in 1966.

The judgment is affirmed.