ALUMINUM COMPANY OF AMERICA
*v.* Virgil D. McCLENDON

75-318                                        535 S.W. 2d 832

Opinion delivered May 3, 1976

*Rose, Nash, Williamson, Carroll, Clay & Giroir,* by: *Phillip Carroll,* for appellant.

*Hardin & Rickard,* by: *Robert N. Hardin,* for appellee.

J. Fred Jones, Justice. This is a workmen's compensa-

tion case in which the self-insured employer, Aluminum Company of America, appeals from a circuit court judgment which affirmed a Commission award of compensation to the appellee, Virgil D. McClendon, on a finding that Mr. McClendon was totally and permanently disabled because of a back injury.

Mr. McClendon was 62 years of age and was contemplating retirement when he injured his back in attempting to lift a heavy piece of machinery in the course of his employment as a mechanic. The appellant and appellee agree that the only question on this appeal is whether there was any substantial evidence to support the Commission's finding that Mr. McClendon was permanently and 100% or totally disabled because of his injury and we conclude that there was not.

The recorded evidence consists of the testimony of the appellee-claimant; the letter reports and testimony by deposition of two medical specialists, Dr. Thomas M. Fletcher, a neurosurgeon, and Dr. Walter G. Selakovich, an orthopedic surgeon. We shall discuss the medical evidence first.

According to Dr. Fletcher, he first saw Mr. McClendon on May 10, 1973, at which time Mr. McClendon complained of low back pain with radiation into the right hip and leg following an accident which occurred on the previous day when Mr. McClendon's foot slipped while he was lifting a heavy object and "he jerked his back and hip." X-rays showed some degenerative changes in the spine with a narrowing of the L-5 S-1 interspace and Dr. Fletcher suspected a ruptured disc. Mr. McClendon showed gradual improvement under conservative treatment by Dr. Fletcher and on July 31, 1973, Dr. Fletcher reported that Mr. McClendon had shown slow but definite improvement, but that he still complained of some pain with activity and exhibited a slight limp while walking. In this report Dr. Fletcher reported a moderate limitation in back motion but deep tendon and motor functions as normal. He reported that since Mr. McClendon's work activity included climbing ladders, stairways, squatting, etc., he would require a longer recovery period before

returning to work and stated he would re-examine Mr. McClendon at the end of one month.

Dr. Fletcher re-examined Mr. McClendon on August 2, 1973, after which he reported that Mr. McClendon was still having difficulty from back pain, stiffness and limitation of motion, and that nerve root irritation in the right lower extremity continued to persist. He advised Mr. McClendon to enter the hospital for physical therapy and that if he did not show improvement within a reasonable period of time after conservative treatment, he would recommend the performance of a myelogram in contemplation of surgery.

On September 19, 1973, Dr. Fletcher reported that Mr. McClendon had shown good improvement following physical therapy in the hospital for approximately eight days and was able to greatly increase his activity, but that on the previous Tuesday he bent over while engaged in some slight activity and experienced the recurrence of his back pain. On this examination Dr. Fletcher found paraspinal muscle and other symptoms normally associated with a disc lesion and he discussed with Mr. McClendon the probable necessity of a myelogram. Mr. McClendon advised Dr. Fletcher that he had had a myelogram about 12 years previously and that he had experienced considerable attending pain and was reluctant to have a myelogram done unless absolutely necessary. Dr. Fletcher expressed doubt that Mr. McClendon would be able to return to regular work activity without surgery and expressed an opinion that Mr. McClendon would eventually have to have a myelogram to completely evaluate the problem.

Dr. Fletcher last saw Mr. McClendon on February 5, 1974, at which time he diagnosed the condition as lumbar disc disease with disc protrusion and he concluded his report as follows:

This patient has degenerative lumbar disc disease and disc protrusion and he states that he can remain relatively free of pain as long as he remains inactive but with even significant degree of walking and any bending, lifting or stooping he gets recurrence of pain. I

would estimate that he has a permanent partial disability of approximately 10 percent of the body as a whole as regards his lower back problem and I think that his problem is a permanent one which will prevent him from returning to regular work activity.

On February 20 and March 3, 1974, apparently in response to inquiries from the employer, Dr. Fletcher expressed the opinion that Mr. McClendon reached the end of his healing period as of January 1, 1974, with a permanent partial disability estimated at ten per cent to the body as a whole and expressed the opinion that Mr. McClendon's problem would prevent him from returning to regular work activity at the same occupation he had prior to injury.

On September 20, 1974, over seven months after he was last seen by Dr. Fletcher, Mr. McClendon was referred by the referee to Dr. Selakovich for orthopedic evaluation of his low back complaints. Dr. Selakovich reported that Mr. McClendon gave a history of having had a myelogram performed some 14 years previously in connection with a similar type injury and in this connection with the old injury, Dr. Selakovich said:

His acute symptoms at the initial injury persisted for a number of weeks, however, he gradually returned to his usual activities and has worked the intervening time without apparent difficulties. Relates he has a work record at Alcoa of at least 20 years. It has been some months since Dr. Tom Fletcher has seen this man.

Dr. Selakovich then reported as to his own findings and recommendations as follows:

Today's examination reveals recurrent low back pain complaints aggravated by posture patterns, carrying or any type of back bending movements or moderately strenuous work. He relates some referral of pain into the left buttocks but does not specifically relate paraesthesias or weakness referable to the lower extremities. Although movements are slow and deliberate they are at least 80% of normal. Straight leg raising is

slow and deliberate also with 80% on the right and 70% on the left. Laseques, Bragard's and Fabers testing and sciatic nerve stretch test are considered negative. Neuromuscular examination is considered normal except for a slight decrease in the left achilles reflex which is improved with reinforcement. There is no sensory deficit. A full lumbosacral series was obtained and a review of these films reveal: There is an obvious decrease in the intravertebral disc space at the L5S1 level and this is associated with sclerosis of the contigious bony surfaces about the disc space. There is also irregularity and degenerative changes about the facets in this area. There also appears to be degenerative disc disease at the L1L2 levels with definite narrowing and degenerative arthritic changes being present. There is no evidence of a list or straightening of the normal lumbar lordosis. The sacroiliac joints and hip joints are normal.

Apparently there has been some general improvement in regard to the objective findings since this man was last seen by Dr. Thomas Fletcher. At this time I do not feel the myelogram is warranted but will concur with Mr. McClendon that a 10% permanent partial physical impairment to the back as a whole does not justify the persistent disability that he has. Also, it is felt that should he obtain a lumbosacral support in addition to continued conservative non surgical management of his problem that he would probably have less symptoms and be able to carry on light type of activities. It is felt that he cannot return to the strenuous type of work that he had been doing at Alcoa. A permanent partial physical impairment of 25% to the back as a whole appears proper. It is recommended that Mr. McClendon obtain the above mentioned support.

Dr. Fletcher's testimony by deposition did not add a great deal to his previous medical reports. Under his deposition Dr. Fletcher said that when he last saw Mr. McClendon he was definitely of the opinion he had a protruding disc that could be relieved by surgery, but that prior to recommending surgery in Mr. McClendon's case, he would desire confirmation by myelogram. However, Mr. McClendon definitely

resisted the performance of a myelogram because of pain he had experienced 10 or 12 years previously following a myelogram. He said it was his opinion that Mr. McClendon had at least a fifty-fifty chance of being returned to practically normal employment following surgical removal of the offending disc and, as to Mr. McClendon's condition when Dr. Fletcher last saw him, he stated as follows:

> I felt after seeing him initially that he had degenerative changes in the lumbar spine and that he had a lumbar disc protrusion or ruptured disc. Under treatment for this he reached a point where he was more or less in a static phase in that as long as he limited activities he didn't have symptoms of much severity, but he wasn't able to return to activities that would be strenuous or even of a moderate type which would involve his work activity, of course.

The substance of Dr. Selakovich's testimony by deposition was to the effect that Mr. McClendon did have a narrow disc space at L-5 S-1 but that the roentgenograms indicated an old disc problem antedating Mr. McClendon's last injury. He said that Mr. McClendon had apparently improved considerably since he was last seen by Dr. Fletcher and Dr. Selakovich was of the opinion a myelogram or surgery was not indicated at the time he saw Mr. McClendon. In this connection Dr. Selakovich said:

> A. . . . I'm saying I don't think that this man has the acute symptoms and findings to warrant performing a major operation on his back because I don't think he has enough findings there that that is necessary.
> * * *
> Q. Do I understand that it's your opinion that he doesn't have a protruded disc but that he just has degenerative disc disease of long standing?
> A. Well, actually it amounts to two things. I think he has disc disease as a basic underlying problem. I don't feel that at the present time of my examination that the protrusion is such as to produce the symptoms which

would warrant doing a myelogram. You see when you do a myelogram, like I mentioned earlier, it prepares the surgeon for a better appreciation of the problem. When he takes the disc out he takes it out because it's got pressure on the nerve sufficient to cause the nerve not to function properly. Now Mr. McClendon's nerve to my mind appears to be functioning properly. In other words, he doesn't have the symptoms of acute pressure on the nerve root and it's for that reason that you do protruded disc removal. You take away this disc that's popped out and eliminate the pressure on the nerve.

\* \* \*

A. He doesn't have those symptoms now as far as the nerve pressure to indicate he needs that. And like I said earlier, I'd like to know if in fact Dr. Fletcher has checked him in the recent past to state that he still feels the same way. You told me it's February. Well, you know a ruptured disc, a lot of people get well without s rgery.
Q. Well, then I take it that you feel that if Mr. McClendon back in February was showing neurological signs which caused Dr. Fletcher to recommend the myelogram and possible surgery, that you didn't find those same neurological signs in September?
A. That's correct.

\* \* \*

Q. But you now say he has improved. Do you feel that he is capable of being a productive individual?
A. I think he can do light type of work that doesn't necessitate a lot of heavy lifting, carrying; a job that doesn't require him to do a lot of back-bending movements, awkward lifting, things like that. Now a light type of job — and I told him to use his support which would assist in that — I think he can do that kind of work.

\* \* \*

A. . . . I think in his own mind too he knows that there has been some change, improvement, and really you could take my examination or you could get an examination of somebody else and I venture to say that with the findings that I noticed on the 20th of September I doubt if anybody would recommend a myelogram.

\* \* \*

Q. Now you came up with a permanent partial impairment of 25 percent to the back, although you state he had improved over the condition apparently that he had back in February when he was examined by Dr. Fletcher, and Dr. Fletcher had assessed only a 10 percent disability.

A. I gave that physical impairment because there is obvious evidence as far as I'm concerned on roentgenograms that he's got the type of back that will not permit him to do things that I've outlined, that he's got a back that will not tolerate strenuous work. He's got evidence of disc problems at three levels. This man's worked for 20 years at one establishment. I have to assume that he's probably incurred that whole thing there to begin with. But irregardless he's had enough changes there that he's got a back that will not tolerate strenuous type of work anymore.

\* \* \*

A. . . . If he can get a light job where he's not constantly bending and picking up and carrying things, heavy type work, awkward lifting, I think he'll function with his support quite well.

On cross-examination Dr. Selakovich testified as follows:

Q. Doctor, how long will it be necessary for him to wear this back brace that you've recommended for him?

A. Off and on it might be from now on. It could be. He could get to the point where he felt real good and then wean himself from it and just use it for those times when he would give himself some stress. They're going to drive to Dallas or some long trip, or go out fishing, what have you, things like that. I think he's the king of guy that shouldn't ride, for instance, farm equipment with a lot of bouncing and jerking. He ought to use it if they go hunting or something, go across some rough country roads. Because he just doesn't have that shock absorber effect of a normal disc.

The claimant-appellee, Mr. McClendon, testified that he was 62 years of age and was a maintenance mechanic for the appellant and had worked at that employment for around 22 years. He said that prior to when he went to work for the appellant he had done automobile mechanic work, and in this connection he testified as follows:

A. Well, I done mechanic work for several years back prior to that.

Q. Is that similar to the mechanic work you were doing for Alcoa?

A. Yes. Similar to it. Only in a way. It's the same name, but otherwise it's not hard work. Alcoa had a heap harder work. Heavy lifting.

Q. I take it when you are talking about your earlier years employment, you are talking about auto mechanic?

A. Auto mechanics. Yes, sir.

Q. And when you talk about mechanic work for Alcoa, that is not auto mechanics, is it?

A. No, sir.

Q. And you say the work for Alcoa was lighter type work than the auto mechanic work?

A. No, sir. It was a heap more times heavier.

Q. I didn't understand you. Which one was lighter?

A. Car mechanic is lighter.

Q. Is lighter than the work you were doing for Alcoa?

A. Yes. Alcoa work, say, like I had a lot of machinery pumps, heavy machinery pumps, heavy motors, this, that, and the other, lifting and prizing, this, that, and the other, that they work on. So, it's a heap harder work than the work on a car, you know. On a car, you use a jack to jack them up and you are working underneath them or on top of them. Ain't no heavy lifting to it like there are over there.

Q. Is that about the only line of occupation you have ever followed during your lifetime?

A. Yes, sir. Back the years before when I was home before I was married, I done farm work.

Mr. McClendon said he had a tenth grade education; that he had lived in and around Benton all of his life; that he

owned and lived on a farm of about 50 acres near Benton where he would keep about 50 head of cattle, but he had sold the cattle because he was not able to attend to them in that he was not able to cut, bale and carry hay in feeding them. He said that prior to his injury on May 19, 1973, he was in good health and able to work. He said he made a garden at his home prior to his injury but that since his injury he had not been able to make a garden like he used to do it. He said he had a garden tractor and that climbing up and down on the garden tractor made his back and head hurt, and that he is unable to push a lawn mower to do any good since his injury. As to making a garden, he said his wife makes most of it. He said his wife does about all the mowing of their lawn but that it is necessary for him to hire someone to fix his fences. He said that prior to his injury he enjoyed fishing and hunting some but that he is unable to fish now like he did. He said he just couldn't work and get out around or lift anything. He then testified as follows:

> Q. Can you tell us using specific instances of your day to day activities of how this has affected you? Things that you cannot do now that you did before?
> A. Well, just a lot of times my back and hip hurts. It hurts maybe two or three days' time. I can hardly get around, limp around on it. Maybe clear up and get by pretty good on it. . . .

Mr. McClendon said he takes aspirin for pain at night but the pain interferes with his sleep quite often. He then testified as follows:

> Q. Now, Mr. McClendon, have you attempted to seek out any type of new employment?
> A. No. I wouldn't be able to. I'm just not able to.
> Q. All right. I'll ask you that question then. Why have you not sought other employment?
> A. Well, because, like I say, I ain't able to do a day's work for anybody. Can't even hold up to do a day's work.
> Q. I take it you discussed with Doctor Fletcher your possibilities of going back to your job at the plant, did you not?

A. Yes.

Q. And he has indicated or he has said very plainly in his reports that you are unable to go back to that work?

A. Yes. That's what he told me.

Q. And since him telling you that, you have not tried to get other employment?

A. No, sir, I haven't. Sure haven't.

Q. My question is, why have you not tried to get other employment?

A. I just ain't able to do a day's work. Ain't able to do work. I don't believe there's any use in trying to go out and get a job when I ain't able to do it, can't do it. Can't do my work around the place there even.

On cross-examination Mr. McClendon said that he had worked as an automobile mechanic for several years before he went to work for the appellant. He said he had worked as an automobile mechanic for Mr. Wickman, George Stroud and then at the Pontiac place in Benton. He said at times he had owned his own garage and had employees working under him. He said he injured the right side of his back about 12 or 14 years ago while helping to lift a large pump and carry it up some stairs. He said he was hospitalized on that occasion and was given a myelogram which was very painful. He said he was fitted with a brace on that occasion and was off work for quite awhile but finally became able to go back to work. He said that after he became able to return to work on that occasion, he was able to continue, and did continue, whatever work was assigned to him. He said that after he went back to work following his previous injury, his back hurt part of the time but that it hurt worse now since he has sustained the injury to the other side of his back. Mr. McClendon then testified on cross-examination as follows:

Q. You haven't made any effort to look around and see what work might be available for you that you could do even though your back hurts you?

A. I don't know of anything. Like I say, I wouldn't want to go out hired — Alcoa won't give me a job back and that's where I worked. Why don't they give me a job back where I can go back to work if I'm able to work. If they won't take me nowhere and do what I can and

what I'm able to do, just set a pencil in my hand writing down a number or something, I'll be glad to do it, but as far as getting out there lifting, doing hard work, I ain't able to, and I won't go out on a job unless I'm able to.

Q. But you consider yourself capable of doing work where you write down numbers with a pencil, is that it?

A. I could do that, yes, sir.

Q. And anybody who has a job that's — Any employer who has work that involves sitting, keeping records or keeping time records or anything, you could do that, couldn't you?

A. Yes, sir, I could. Yes, sir.

At the conclusion of the testimony the appellant's attorney suggested that Mr. McClendon be returned to Dr. Fletcher for a current examination for a determination of whether he was better or worse than when Dr. Fletcher last saw him, and whether he would now recommend surgical intervention. As an alternative the appellant's counsel expressed the desire to take Dr. Fletcher's deposition. The appellee's counsel objected to further delay in the matter and argued that in the light of the doctors' reports and a previous statement by the appellant's counsel, that he did not desire to cross-examine Dr. Fletcher, that the right to orally examine Dr. Fletcher had been waived by the appellant. The referee permitted the taking of Dr. Fletcher's deposition and in doing so stated:

I'm going to do that without requiring another examination. I don't think that would gain anything. Doctor Fletcher knows as much about Mr. McClendon's condition as he's ever going to know at this point. I will give each of you a chance. The Respondents can ask him what he thinks one way or the other, and you can point out the Claimant's age and everything else and make sure that he fully considers it.

"Disability" within the Workmen's Compensation Law means incapacity because of injury to earn, in the same or any other employment, the wages which the employee was receiving at the time of the injury. Ark. Stat. Ann. § 81-1302 (e) (Repl. 1960). Whether or not a claimant in a workmen's

compensation case has sustained such injury and the extent thereof, are questions of fact to be determined by the Commission from the competent evidence and courts do not disturb the Commission's findings if the evidence on which they are based is substantial. But the question as to whether such evidence is substantial is a question of law.

Substantial evidence has been defined as "evidence that is of sufficient force and character that it will, with reasonable and material certainty and precision, compel a conclusion one way or the other. It must force or induce the mind to pass beyond a suspicion or conjecture." Ford on Evidence, vol. 4, § 549, page 2760. Substantial evidence has also been defined as "evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences." Wigmore on Evidence, vol IX, 3rd ed. § 2494, footnote at page 300. See also *Tigue* v. *Caddo Minerals Co.*, 253 Ark. 1140, 491 S.W. 2d 574; *Goza* v. *Central Ark. Dev. Council*, 254 Ark. 694, 496 S.W. 2d 388.

Apparently Dr. Fletcher in the case at bar considered Mr. McClendon a likely candidate for the surgical removal of a protruding disc and considered that his symptomatic pain could be eliminated or greatly reduced by such procedure, and that there would be at least a fifty-fifty chance that Mr. McClendon would be able to return to his regular employment. Mr. McClendon resisted such procedure because of prior pain he had experienced from a myelogram which Dr. Fletcher also recommended for the purpose of confirming his opinion as to the extent and exact location of the suspected protruding disc prior to surgery. Dr. Fletcher found that Mr. McClendon's condition was improving up to his last examination of him.

Ark. Stat. Ann. § 81-1311 (Supp. 1975) provides as follows:

> . . . where an injured person unreasonably refuses to submit to a surgical operation which had been advised

by at least two (2) qualified physicians and where such recommended operation does not reasonably involve risk of life or additional serious physical impairment the Commission may, in fixing the amount of compensation take into consideration such refusal to submit to the advised operation.

Of course, in the case at bar only two qualified physicians examined Mr. McClendon and Dr. Selakovich found that his condition had greatly improved over what it evidently was when Dr. Fletcher last saw him.

Ark. Stat. Ann. § 81-1319 (i) (Supp. 1975) provides as follows:

The Commission may upon its own initiative at any time where compensation payments are being made without an award, and shall in any case where the right to compensation has been controverted or where payments of compensation have been suspended, or where an employer seeks to suspend payments made under an award, or on application of an interested party, make such investigation, cause such medical examination to be made, hold such hearings, and take such further action as the Commission deems proper for the protection of the rights of all parties.

The Commission referee did send Mr. McClendon to Dr. Selakovich whose findings are above set out in some detail and will not be summarized here. Dr. Selakovich, in explaining the difference of his estimate of permanent partial disability and that of Dr. Fletcher, in the light of Mr. McClendon's apparent improvement, testified that he went beyond the strict functional disability and considered to some extent the types of work Mr. McClendon had done and was capable of doing. From the entire record it would appear that the evidence pertaining to the extent of permanent disability in this case falls somewhere between that submitted in *Wilson & Co.* v. *Christman,* 244 Ark. 132, 424 S.W. 2d 863 (1968), and the evidence submitted in *Ray* v. *Shelnutt Nursing Home,* 246 Ark. 575, 439 S.W. 2d 41. We deem it unnecessary to review the evidence submitted in those two cases. In *Christman* the highest medical estimate of permanent partial disability was

30% and we affirmed the Commission's award of 60%. In that case there was other evidence beside medical and Christman's own testimony pertaining to his unemployable status. In *Ray* v. *Shelnutt Nursing Home* Mrs. Ray had undergone the removal of a ruptured disc and had spinal fusion. She was younger than the appellee in the case at bar but like Mr. McClendon she had experience in lighter types of work than she was doing at the time of her injury. While Mrs. Ray did not testify as to things she was unable to do, she did testify that she had not done any work or attempted to work since her injury, whereas, Mr. McClendon testified that he was unable to lift bales of hay in feeding his cattle; that he was unable to work his garden or mow his lawn as well as he did prior to his injury. He testified that he would be able to hold a job such as timekeeper and also testified that he was an experienced automobile mechanic and had owned and operated his own business as such. He said auto mechanic work was many times lighter than the work he was doing when he was injured. Like Mrs. Ray, Mr. McClendon had sought no other employment. The medical estimate of permanent partial disability in *Ray* v. *Shelnutt* was 20%; the Commission awarded 40% and we sustained the trial court's reversal as to the additional 20%. We only cite the *Christman* and *Ray* cases for comparison of the evidence and we in no sense suggest that Mr. McClendon's permanent disability is somewhere between the 20% awarded Mrs. Ray and the 60% awarded Christman. Neither do we suggest that we would not have affirmed a greater award than 60% in *Christman,* or that we would not have affirmed such award as the Commission may have made in *Ray* if there had been substantial evidence to support it. In other words, we make it perfectly clear that we do not suggest the extent of Mr. McClendon's permanent disability. We only say that we find no substantial evidence to support the Commission's finding that Mr. McClendon was 100% disabled and the Commission's award of *permanent total* disability.

The judgment is reversed and this cause remanded to the circuit court with directions to remand to the Commission for further procedure and consideration not inconsistent with this opinion.

Reversed and remanded.