BICKFORD *v.* CARDEN.

4-8916                                    221 S. W. 2d 421

Opinion delivered June 20, 1949.

*Paul L. Washington* and *Hal L. Norwood,* for appellant.

*Shaw and Spencer,* for appellee.

GRIFFIN SMITH, Chief Justice. The appellant, Bickford, through inheritance, claims an interest in Polk County lands owned by Bota Carden when he died intestate in December 1946. The appellee, Grady Carden, has acquired title of all the heirs except Joe Carden Bickford, who says his father was Julius Carden, and that Julius was Bota Carden's brother.

The Special Chancellor found that appellant's claim should be denied for want of proof that his father and mother were competent to contract a common law marriage, each, at the time their relationship began, having a living spouse.

Oklahoma is one of eighteen states where recognition is given common law marriages, hence appellant's status must be determined by the laws of that forum. In this State, 5 Ark. Stats. (1947) 55-110, all marriages contracted in another jurisdiction which would be valid where made, and where the parties then actually resided, "shall be valid in the courts of this State". See *Feigenbaum* v. *Feigenbaum*, 210 Ark. 186, 194 S. W. 2d 1012.

We have held that the children of a marriage void because the husband and father had a former wife living, are legitimate and entitled to share in their father's estate. *Evatt* v. *Miller*, 114 Ark. 84, 169 S. W. 817, L. R. A. 1916C, 759; *Cooper* v. *McCoy*, 116 Ark. 501, 173 S. W. 412.

Appellant's claim that Julius Carden was his father, and his contention that Julius and Eva Bickford contracted a common law marriage, are referable to transactions on a farm near Shawnee, Oklahoma, between 1904 and 1908. Julius Carden was suspected of bank robbery, in Arkansas, and he was evading officers. After arrest and conviction he was killed while attempting to escape.

Montgomery County records show that Julius Carden and Naomie Reeves were married at Mt. Ida October 6, 1904, and were divorced February 5, 1908. Appellant was probably born in 1907. Ann Herndon had a daughter named Eva, who married Harry Bickford in Kansas. Mrs. Herndon testified that Eva's marriage to Bickford occurred in June, but she did not remember the year. Before Julius Carden appeared as a temporary cotton picker on the Littleton farm near Shawnee—close to where the Herndons then lived—Eva had given birth to three children, conceded to have been Bickford's. During Bickford's frequent periods away from home, Julius began keeping company with Eva. Bickford wrote Mrs. Herndon, or some member of the family, that he had divorced Eva "and had married another woman". Julius frequently lived with Eva in her mother's home, contributed to her upkeep, and, according to Mrs. Herndon and one or two other witnesses, introduced her as his

wife. After Joe was born Julius left the community, but sometimes came back and always mentioned Joe as his son and Eva as his wife. The child, however, was never called Carden. The grandmother explained this by saying that when she and Eva and other members of the family found that Julius was wanted as a criminal, "she couldn't get rid of him. It was all in the papers, here and everywhere".

Eva's fifth child, Bobby, was younger than appellant. It is conceded that Bickford was Bobby's father; hence, if Bickford's alleged letters regarding a divorce from Eva and his marriage to another spoke the truth, he later returned to Oklahoma and cohabited with his ex-wife, whom his former mother-in-law claims was then Carden's common-law life. A birth certificate shows that Bobby was born November 6, 1910, and his parents were listed as Harry and Eva Bickford.

We think the record amply supports the Special Chancellor's finding that appellant was "not more" than the product of an illicit relationship between Julius Carden and Eva Bickford, conceived at a time when neither was capable of contracting marriage under the common law prescripts of Oklahoma.

A discussion of common law marriages in Oklahoma is to be found in the opinion of Judge Alfred P. Murrah, of the Tenth Court of Appeals. See *Jones* v. *Kemp,* 144 Fed. 2d 478. Such marriages are valid if based upon a good faith intention to enter into a lawful relationship.[1] A West Publishing Company headnote to the Jones-Kemp case reads: "Where at time man and woman commenced living together in Oklahoma the woman had a living undivorced husband, there was no valid 'common law marriage', and the relationship between parties did not, without more, ripen into a legal marriage upon death of undivorced husband two years thereafter". The Oklahoma cases make use of the words "competent parties" in determining whether at the inception of a common

---

[1] Judge Murrah's opinion is cited because the author is a native Oklahoman. He was born in Johnston County in 1903, graduated from a Tulsa high school, was appointed U. S. District Judge in 1937, and promoted to the Court of Appeals in 1940.

law relationship the foundation for marriage existed. Since a civil contract is involved, each participant must be without legal impediment. If restrained by obligations to another the purpose cannot be consummated.

Appellant argues, in the alternative, that if the common law marriage failed, still he is protected by Tit. 10, § 55, Okla. Stats. 1941. It provides that "the father of an illegitimate child by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth".

Construing the foregoing section, a *per curiam* opinion in *Thompson* v. *Thompson,* 177 Okla. 437, 60 Pac. 2d 615, held that Mamie and George Thompson, to establish their claim of legitimation, were required to prove (1) illegitimacy, (2) paternity, (3) public acknowledgment by the father, (4) reception into family with wife's consent, and, (5) treatment as legitimate. See *Orsburn* v. *Graves,* 213 Ark. 727, 210 S. W. 2d 496.

An annotation in 73 A. L. R., p. 942, dealing with the law of the situs of property, as such, as determining legitimacy, contains this comment: ". . . The question whether a child born out of wedlock is or is not legitimate, though arising in connection with his right to inherit property, relates not to the descent or distribution of property, but to his status, and as such is to be governed not by the law of the situs as such, but by the law of the state creating the status".

Chief Justice Gray, in *Ross* v. *Ross,* 129 Mass. 243, 37 Am. Rep. 321, said: "It is a general principle that a status or condition of a person, the relation in which he stands to another person, and by which he is qualified or made capable to take certain rights in that other's property, is fixed by the law of the domicile, and that this status and capacity are to be recognized and upheld in

every other state, so far as they are not inconsistent with its own laws and policy".[2]

It is urged by appellant that consideration should be given the presumption that if Harry Bickford had ever been the husband of Eva Herndon, he had obtained a divorce before Eva began her associations with Carden—"even though it involves the proving of a negative". But if this should be conceded, there remains the further fact—testified to by Eva's mother, and by appellant—that after appellant was born, and while what is claimed to have been a common law marriage continued, Bickford's cohabitation with Eva was responsible for her fifth child.

Appellant's entire proof was directed to the single effort of proving legitimacy. We think the Special Chancellor correctly found that incapacity to contract prevented the relationship between Julius and Eva from attaining the status contemplated by the standards of conduct and ability mentioned in numerous decisions of the Oklahoma Supreme Court. Nor can appellant prevail on the theory that while his position as a valid common law child has failed, the proof preponderated to establish confirmed illegitimate fatherhood. Most of the testimony tending to show recognition of Eva's fourth child by the putative father was given by interested parties, and is too sketchy to be of actual value in a case where the point to be proved involved opposing facts.

Affirmed.

---

[2] The so-called "right" as fixed by domiciliary laws, is a matter of comity, not controlled by the constitutional provision relating to full faith and credit. *Olmstead* v. *Olmstead*, 216 U. S. 386, 30 S. Ct. 292, 54 L. Ed. 530, 25 L. R. A., N. S., 1292.