HORSESHOE BEND BUILDERS, Employer,
THE TRAVELERS INSURANCE COMPANY
*v.* Frank A. SOSA, Jr., Employee

75-212                                    532 S.W. 2d 182

Opinion delivered February 9, 1976

268

*Wright, Lindsey & Jennings,* for appellants.

*Murphy & Blair,* by: *H. David Blair,* for appellee.

J. FRED JONES, Justice. This is a workmen's compensation case and the question is whether there was any substantial evidence to support the Commission's finding, as affirmed by the circuit court, that the claim was controverted by the appellant insurance carrier and in awarding attorney's fee against the carrier in addition to compensation awarded to the appellee-claimant.

The facts appear as follows: On July 23, 1973, the appellee-claimant, Mr. Sosa, injured his left leg[1] when he fell from a scaffold while working as a carpenter's helper on a building at Horseshoe Bend. The appellee was sent to Dr. Carhart, an osteopath and only physician in Horseshoe Bend, and apparently an A8 or first report of injury form prescribed by the Commission was sent to the compensation carrier by the employer indicating the injury to be of a minor nature with no compensable lost time indicated. The appellee did not return to the job site or contact his employer;

---

[1]Apparently consisting of herniated muscle or muscle sheath in the left leg resulting in a release of blood and formation of a blood clot.

however, he did continue to go to Dr. Carhart for a period of approximately two weeks and when Dr. Carhart indicated to the appellee that he intended to dismiss him as able to work the appellee contacted his attorney, Mr. Blair. Through attorney Blair's assistance the appellee obtained an appointment with Dr. Langevin, a general surgeon in West Plains, Missouri, who first saw the appellee on August 9, 1973.

On August 15, 1973, Dr. Langevin reported to Mr. Blair that the appellee was seen by the doctor on August 9, 1973, complaining of lumbo sacral pain and inability to bear weight on his left leg. He then stated:

> "Examination revealed a large sub periosteal hematoma over the left tibia, gross blemish discoloration down the left lower leg, and tenderness over the sacroiliac joints and right buttock.
>
> * * *
>
> In my opinion, permanent disability would not be expected but a hematoma such as he has on this left leg, can be debility for some time."

The record is not clear on the point but apparently the appellee was paid some amount of compensation while under the treatment of Dr. Langevin. In any event on October 2, 1973, Dr. Langevin reported to the compensation carrier as follows:

> "Since the last time we made a report, I saw Mr. Sosa twice, 8-23-73 and 8-30-73. On the last visit I aspirated 7cc of blood from the hematoma over the left tibial area.
>
> I have not seen him since 8-30-73 and assumed that he had not returned because he was well."

On October 4, 1973, the appellee's attorney, Mr. Blair, wrote a letter to Mr. Ray Henthorne, the compensation carrier's representative, as follows:

> "I interpret Dr. Langevin's letter to you of October 2,

1973, to indicate that Mr. Sosa's healing period was terminated on August 30, 1973. I assume that you will pay him benefits to this time, which should conclude his claim.

I am enclosing herewith a copy of a statement from Dr. Langevin dated October 10, 1973, which, to my knowledge, has not been paid, and also a statement dated August 15, 1973, for medical services to Mr. Sosa, which I have already paid myself. If you could pay the October statement directly to Dr. Langevin and reimburse me on the August statement I would appreciate it very much."

Apparently the amounts were paid and the claim considered terminated by the carrier as of August 30, 1973, as requested and suggested by the appellee's attorney in the October 4 letter, *supra*, and as hereafter indicated in correspondence dated December 14.

On December 4, 1973, Dr. Langevin made another report to Mr. Blair which stated in part as follows:

"This [is] a note concerning the patient Frank Sosa I talked to you about on the telephone.

As I told you I had not seen him since 8-30-73 and presumed he was well until he walked into my office 11-12-73. At that time he had a rather severe swelling of lymphedema of the left lower leg from the knee down which was also painful and extremely tender."

Dr. Langevin then stated that the appellee was hospitalized; the swelling reduced by treatment and that he was fitted with an elastic stocking and instructed to wear it at all times during the day. He concluded this report as follows:

"I will follow him in the clinic until we see if this is going to be a permanent deficit."

On December 10, 1973, the appellee's attorney wrote another letter to Mr. Henthorne advising of the most recent

medical report from Dr. Langevin and enclosed a copy of the report and Dr. Langevin's bill. This letter then concluded as follows:

> "I believe Mr. Sosa would be still entitled to temporary permanent [sic] benefits and if you could pay them from the time they were terminated to date I would appreciate it. Also, if you would please take care of the enclosed statement from Dr. Langevin I would appreciate that also.
>
> If there is any problem about any of these items please let me know.
>
> When I have some further word on him I will relay it to you."

On December 14, 1973, Mr. Blair wrote another letter to Mr. Henthorne and this letter was apparently returned by Mr. Henthorne with Mr. Henthorne's handwritten reply on the bottom thereof. The letter from Mr. Blair recited as follows:

> "I received and thank you for the check in the amount of $37.50 for payment of the outstanding medical expenses in connection with the above-numbered claim.
>
> I assume that the check for back temporary total was forwarded directly to Mr. Sosa. If I am in error on this please let me know."

The handwritten reply from Mr. Henthorne recited as follows:

> "Sosa pd $333.00 comp; I've also pd Dr. Langevin $20.00 and you & clmt $37.50.[2] Apparently add'l TTD benefits will be due and I'll discuss that with you on my next visit to Batesville."

On January 11, 1974, Mr. Blair mailed to the carrier an

---

[2]Apparently the reimbursement check to attorney Blair was made payable to him and his client.

additional statement from Dr. Langevin which indicated that the appellee was still under his care; and on January 17, 1974, Mr. Henthorne wrote a letter to the secretary of the Commission with copy to attorney Blair, as follows:

"Concerning your letter of January 4, 1973 and our conversation of January 14, 1974, please be advised that the above captioned case has been accepted as a compensable workmen's compensation claim from the beginning and has not been controverted for any reason. We have been working with attorney David Blair for quite some time now and will continue to do so until the claimant has been released by his physician.

Should you have any questions concerning this matter, please correspond with me at my address in Jonesboro."

On January 22, 1974, Mr. Blair wrote a letter to Mr. Henthorne as follows:

"I had a call today from Frank Sosa, telling me that he had not received any compensation benefits since a check for $207.00 which he received in December.

Mr. Sosa was injured on July 23, 1973. He has been disabled by that injury since that time and is entitled to Workmen's Compensation benefits at the rate of $63.00 per week. According to my calculations he is entitled to approximately $1,266.00 temporary total disability benefits but he has only received $330.00.

Incidentally, Mr. Sosa is continuing to see Dr. Langevin in West Plains.

I am also informed by Mr. Sosa that he is having a rather desperate time in getting by due to a lack of income.

Therefore, I must request either that his benefits be paid up to date or that this matter be set immediately for hearing, and by copy of this letter I am making that request upon the Commission."

On February 6, 1974, Mr. Blair sent another statement from Dr. Langevin to Mr. Henthorne and on the same date Mr. Henthorne wrote a letter to Mr. Blair with copy to the Commission and to the appellee. This letter was as follows:

"In reference to the above captioned matter, we received an A-8 from our insured on July 27, 1973, indicating one week's disability on the part of the claimant. Dr. Carhart was the attending physician at that time. Due to the fact that there seemed to be no lost time in the excess of one week, no temporary total benefits would be payable. I mentioned that we received this A-8 on July 27, 1973, but actually that was the date on the form, our Little Rock office not receiving the form until August 6, 1973. I then received a letter from the Workmen's Compensation Commission enclosing an A-7 you had filed and I called you on August 15, 1973 to discuss the matter. You then advised me that although Dr. Carhart had indicated that claimant could return to work, he was not able to so you sent him to Dr. Langevin in West Plains, Missouri. You also told me you would get a report from him and forward it to me. At this point, there was no medical at all to substantiate that the claimant was unable to work, and on August 22, 1973 I received your letter of August 20, 1973 along with the report from Dr. Langevin indicating that he had seen the claimant once, August 9, 1973. On this very date, I sent a temporary total draft to the claimant in the amount of $126.00 for the priod of July 24, 1973 to August 7, 1973 and dictated the letter to the Workmen's Compensation Commission advising them that the claim had been accepted as compensable. I heard no more from you or Dr. Langevin by September 29, 1973, so I called you and you said that you had heard nothing from them either and would try to get in touch with one or both parties and give me an up-to-date medical report. On September 25, 1973 I wrote Dr. Langevin requesting the medical and his bill. His report of October 2, 1973 stated that he had only seen Mr. Sosa twice since his initial report, these visits being on August 23 and August 30, 1973, and he assumed that he had not returned because he was well. Your letter to me dated

October 4 1973 indicated that you had interpreted Dr. Langevin's letter as meaning that Sosa had reached the end of his he 'ling period on August 30, 1973, and that we should pay temporary total benefits to that time and close out the claim. We agree to this, and benefits were subsequently paid out and finals sent. Since that time, there has been additional correspondence from you demanding that we pick up temporary total benefit payments where they were last left off and bring them up to date. Al o, you had filed another A-7 with the Commission prior to writing me.

I have been in Batesville on two different occasions since this correspondence began again but have not been able to reach you. As we have previously accepted this claim as being compensable, we will quite naturally continue to give full consideration to the possibility that additional temporary total is due. However, you can see that there is a definite question as to how much temporary total we owe in addition to what has previously been paid. All I have at this time [is] Dr. Langevin's letter to you indicating that he had not seen Mr. Sosa since August, assuming he was well, and that he suddenly walks in on November, 1973 with a swollen leg. I am ttempting to obtain the necessary medical from Dr. L ngevin and would appreciate any reports that you might have received from him.

I see no reason that we cannot work this matter out among ourselves, and if you would care to bring this claim to a conclusion on that basis, please feel free to get in touch with me at my office in Jonesboro. I intend to be in Batesville again next week and will attempt to contact you at that time to see how you want to handle the matter."

On February 11, 1974, Mr. Blair answered Mr. Henthorne's letter as follows:

"I am on this date writing to Dr. Langevin asking him for a report clarifying the questions raised in your recent letter. As soon as I receive it I will forward it to you.

You have Mr. Sosa's address and if you want to take a statement from him verifying his disability from this injury you certainly have my permission to do so, and if there is any further information I am able to furnish you please let me know.

I anticipate that we will be able to resolve this matter without a hearing but I think we should go ahead and get the hearing scheduled in the event we are unable to do so. Mr. Sosa has been out of work since last summer and is in a pretty tough position."

On February 13, 1974, Dr. Langevin reported to Mr. Blair that the appellee still had swelling in his leg when he did not use support, but that it would probably be 18 to 24 months before it could be determined whether there was any permanent disability. Dr. Langevin reported that he thought riding heavy equipment would be out as far as the appellee was concerned, but that he should be able to do work that did not require prolonged standing.

On February 14, 1974, Mr. Blair wrote a letter to Mr. Henthorne with copy to the Commission and to the claimant authorizing Mr. Henthorne to contact the claimant direct and take a recorded statement from him. Apparently Mr. Henthorne did contact the appellee and apparently had him examined at the Ozark Orthopedic Clinic in Harrison because under date of August 2, 1974, Dr. Charles Ledbetter reported to the compensation carrier that he found, on examination of Mr. Sosa on that date, in part as follows:

"The impression is: 1. Resolved subperiosteal hematoma, left proximal tibia. 2. History of thrombophlebitis, left. 3. Peroneal muscle hernia, left. It is my impression that this man's disability would be less than 5%."

Under date of September 4, 1974, the claimant's supervisor for the compensation carrier wrote a letter to Mr. Sosa with copy to the attorneys and the Compensation Commission as follows:

"This letter concerns your workmen's compensation claim arising on July 23, 1973 while employed by Horseshoe Bend Builders. We are in receipt of a report of Dr. Charles Ledbetter of August 2, 1974 concerning his examination and evaluation of that date. Such report shows that you are released from treatment and that permanent partial disability resulting from the accident and injuries in question would be less than 5% to the body as a whole. We are accepting this rating of 5% to the body and will make payment of permanent partial disability on that basis.

Enclosed please find our draft in the amount of $252.00 representing permanent partial disability benefits for the period of August 2, 1974 to August 30, 1974. Beginning September 27, 1974 we will issue our draft every four weeks in the amount of $252.00 until a total of 22.5 weeks of benefits have been paid."

This letter apparently referred to payments for a five per cent loss of use of the leg and not to temporary total disability.

At the hearing before the referee on April 26, 1974, it was stipulated that the employer-employee-carrier relationship existed on July 23, 1973, when the claimant did sustain a compensable injury, and that the claimant had been paid some temporary total disability and medical benefits.

It was the contention of the claimant that he had been totally disabled from July 23, 1973; that he was still totally disabled and would continue to be totally disabled and require medical treatment for 12 to 24 months in the future. The claimant then contended that the claim had been controverted but this was denied by the compensation carrier. The attorney for the compensation carrier stated as follows:

"Your Honor, we have never controverted the compensability of the claim or any temporary total disability which has been substantiated by any medical reports or any evidence furnished by the claimant. The last medical report that we had available indicated as of August 30, 1973, the claimant had not been back to see

the doctor that was treating him and on the basis of that report, Travelers terminated the temporary disability as of that date. Subsequently they learned the claimant had not returned to work and we made some efforts to substantiate that with additional medical reports and had some discussions with the claimant's attorneys and we've never been able to establish with any degree of certainty how much time the claimant missed or whether or not it was related to the injury, so we're here today to — we really don't intend to controvert any period of temporary total disability that the claimant has had since the accident if it's substantiated by the medical reports or it's been a time when he's actually been employed since the accident."

It was then agreed that correspondence between the attorneys and claims representative, in relation to the claim, would be submitted in evidence.

It is certainly apparent from the record in this case that the matter was handled in a careless or dilatory manner from its inception but it is difficult to tell who was most at fault.

Mr. Sosa apparently sustained a herniated muscle in his left leg resulting in a blood clot attended by intermittent swelling and pain. It would appear from his testimony that he never did return to his former employment following his injury but sought other employment, and sought medical attention and additional legal advice from his attorney only when his leg would swell. He testified in part as follows:

"Q. Did you try to work, did you try to go back to your job at Horseshoe Bend after August 30?

A. I didn't think I wanted to go back to carpentry any more.

Q. Did you ever go back out there and talk to them about trying to do any more work?

A. I haven't seen anyone.

Q. You've just never been back since the day you got hurt?

A. That's right.

Q. You've made no effort to return to work out there?

A. No sir.

Q. What was the reason for your trip to St. Louis?

A. Visiting, I'd never been there."

There was some evidence that the appellee did attempt to contact the compensation carrier's representative by telephone but was unable to do so, and there was also evidence that the insurance representative attempted to contact the appellee and was unable to do so. The appellee admitted receiving one or two letters from the insurance carrier's representative requesting a meeting for the purpose of discussing his condition. He said he probably received such letter dated March 6 (respondent's exhibit 3) but then he said: "I was selling property, I couldn't get away, he called and I couldn't break away." The appellee said that he never did submit any of his medical bills to the compensation insurance carrier. He said he remembered seeing Dr. Langevin on August 30, 1973, when the doctor aspirated some blood from the clot on his leg. He said he was fitted with an elastic stocking and that as long as he kept it on, his leg did not swell, but when the stocking came down or he removed it, the leg would swell again and become painful. He said he went to Dr. Langevin a little over a month and then went to St. Louis with some friends to visit. He said that while in St. Louis he applied for unemployment compensation which was denied; that he then worked three days pushing a lawn mower cutting grass in St. Louis and that when his leg began to swell again, he returned to Arkansas. He said he attempted to find work when he returned to Arkansas and did obtain a job operating a backhoe, but that after working six days his leg swelled again and he had to quit. He said that when his leg would swell, he would return to Dr. Langevin.

The Commission found, as did the referee, that the appellee was temporarily disabled from July 23, 1973, through August 2, 1974, and there is no appeal from the award of compensation based on that finding. The referee found that the claim had not been controverted but the full Commission concluded that it had been. The full Commission was rather critical of the manner in which the appellants serviced this claim and we are unable to say some criticism was not justified. The Commission stated that there was no suggestion that the employer filed the required "Employer's First Report of Injury,"[3] or that compensation was paid within the statutory time limit of 15 days; that following Dr. Charles Ledbetter's anatomical impairment rating in his report of August 2, 1974, payment of accrued compensation in the amount of $252 covering the first four weeks of compensation due as a result of the physician's rating was not issued to the appellee until September 4, 1974. The Commission then recited from a letter by the carrier indicating that future payments would be made every four weeks in the amount of $252 until a total of 22.5 weeks of benefits had been paid. The Commission stated that this was in violation of Ark. Stat. Ann. § 81-1319 (b) (Repl. 1960) which provides for the payment of compensation benefits every two weeks. In its statement of the case the Commission stated, "Claimant further revealed he had worked a total of six days since July 23, 1973." The Commission apparently overlooked the additional three days the claimant said he worked while in St. Louis, Missouri.

It is apparent from the overall record that following the appellee's initial injury he contacted his attorney before or about the time his first compensation would have been due. The attorney sent the appellee to a physician of his and the appellee's choice who made most of his reports to the appellee's attorney, who would forward the reports and medical bills to the compensation carrier. The record does not reveal the nature of the requests for medical reports made by the appellee's attorney or the compensation carrier, but none of the medical reports say that the appellee was unable to work. It is apparent that the appellee's doctor, his at-

---

[3]Apparently the A-8 report which the employer sent to the carrier was never filed with the Commission.

torney, and the compensation carrier thought the appellee's healing period ended on August 30, 1973. The appellee was apparently paid through that date and the claim considered closed by all parties concerned until the appellee's leg swelled and became painful and he returned to the doctor on December 11, 1973. We are of the opinion that the appellant carrier was entitled to some evidence, medical or otherwise, that the appellee was again experiencing temporary total disability because of his injury before resuming compensation payments.

The appellant-carrier may have been dilatory, even to the point of negligence, in its follow up on the appellee's injury and any wage loss occasioned thereby, but the carrier attempted to deal through the appellee's attorney who apparently was having some difficulty in keeping in touch with the appellee and keeping abreast of his condition. In any event dilatory payments of compensation does not amount to a controversion *per se*. Ark. Stat. Ann. § 81-1319 (Repl. 1960) provides the time and manner for making workmen's compensation payments and subsection (d) of § 81-1319 provides as follows:

> "Each employer desiring to controvert the right to compensation shall file with the Commission, on or before the fifteenth (15th) day following notice of the alleged injury or death, a statement on a form prescribed by the Commission that the right to compensation is controverted on the grounds therefor, the names of the claimant, employer, and carrier, if any, and the date and place of the alleged injury or death. Failure to file such statement of controversion shall not preclude the urging of any defense to the claim subsequently filed, nor shall the filing of a statement of controversion preclude the urging of additional defenses to those contained in such statement of controversion."

Subsections (e) and (f) provide for penalties for failure to make timely payments and subsection (i) provides for investigations to be made by the Commission upon its own initiative.

Ark. Stat. Ann. § 81-1332 (Repl. 1960) provides in part as follows:

> "Whenever the Commission finds that a claim has been controverted, in whole or in part, the Commission shall direct that fees for legal services be paid by the employer or carrier in addition to compensation awarded, and such fees shall be allowed only on the amount of compensation controverted and awarded. Whenever the Commission finds a claim has not been controverted, but further finds that bona fide legal services have been rendered in respect to the claim, then the Commission shall direct the payment of such fees out of the compensation awarded."

The mere failure of an employer or compensation carrier to pay compensation benefits to an injured employee does not in and of itself amount to a controversion. Especially is this true when the compensation insurance carrier accepts the injury as compensable and it and the claimant's attorney are attempting to determine the periods and extent of the claimant's disability.

In *Pike Cty. Poultry Co.* v. *Kelly*, 243 Ark. 460, 420 S.W. 2d 523, cited by the appellee, it was not denied that part of the claim was controverted. In that case we pointed out the appellee's testimony that after November 29, 1965, she went to her doctor for treatment several times because she was suffering with her back; that she was not able to work and was still disabled. We then recited some of the medical findings supporting the claimant's contention and then in that case we said:

> "It is not denied that the above testimony (and more of the same purport) was controverted by appellant."

The appellee in the case at bar says:

> "In view of the action, or inaction of Appellant, clearly the services of any attorney were reasonably required by Appellee in order to secure his compensation benefits. Since a hearing was required to determine Appellee's

282

claim, it is difficult to perceive how Appellant can now content the claim was [not] controverted. Under the circumstances of this case Appellee was justified in employing counsel, and this expense should be left where the Commission placed it." Citing *Pike Cty. Poultry Co.* v. *Kelly, supra.*

The appellee was injured on July 23, 1973. He was not entitled to payment of compensation in any event until August 7, 1973. His attorney arranged for his examination by Dr. Langevin on August 9, 1973, so it would appear that he was represented by employed counsel from the very beginning in this case. We do not say that all controversions must be on forms prescribed by the Commission, and we do not overrule anything we said in *Littlejohn* v. *Earle Industries,* 239 Ark. 439, 389 S.W. 2d 898, cited by the appellee in his trial brief. The distinguishing language in that case is set out as follows:

"The appellant was injured on June 18, 1963. His attorney properly filed his claim with the Commission shortly thereafter. The appellees then requested a thirty-day extension before stating their position on controverting the claim. Over appellant's objection, a ten-day extension was granted. On September 23, 1963, the appellees stated they 'neither admitted nor denied that the claimant was entitled to compensation.' The appellees later offered to pay compensation to the claimant on the basis of 10% disability conditioned upon an order of final discharge by the Commission since the claim appeared 'suspicious.' The appellant responded by asserting the evaluation of permanent disability was premature since appellant maintained that he was unable to return to work on October 6, 1963, despite his own medical reports. The claimant steadfastly protested that he had not fully recovered from his back injury and an operation on August 24th to correct this injury."

The initial burden, of course, rests upon the claimant in any case to make out a claim for compensation. When the claim is once accepted by the respondent as compensable, the burden rests upon the respondent to make compensation

payments and continue them during the continuation of the disability. We are of the opinion that the difficulty in this case boils down to a claimant who was difficult to find and keep up with; an attorney who was, perhaps, too busy to go hunting for his client; a doctor who never reported as to whether his patient was or was not disabled to work; and, a compensation carrier, perhaps understaffed and overworked, who depended on the appellee's attorney more than on the initiative of its own claims staff in seeking out the claimant and servicing his claim by prompt payment or controversion. In the case at bar the appellant-respondent may have been guilty of undue delay in payment, but we are of the opinion that the appellee-claimant's right to compensation was not controverted within the meaning of the Act under the evidence in this case.

The judgment is reversed and this case is remanded to the circuit court with directions to remand to the Commission for a determination on attorney's fee not inconsistent with this opinion.

Reversed and remanded.