PICKENS-BOND CONSTRUCTION CO., Employer
And ST. PAUL INSURANCE CO., Insurance
Carrier *v.* Arguss CASE, Employee

78-181                                    584 S.W. 2d 21

Opinion delivered July 9, 1979
(In Banc)

324

*Andrew L. Clark,* for appellants.

*Bud Whetstone,* of *Whetstone & Whetstone,* for appellee.

JOHN A. FOGLEMAN, Justice. Arguss Case suffered a compensable injury when he fell at least 25 feet from the fourth floor of a building in the course of his employment by Pickens-Bond Construction Company. The original injury occurred on or about February 2, 1973. On or about November 1, 1973, appellant slipped and fell and suffered a broken hip as he was walking across the floor on his crutches while attending a rehabilitation orientation. At a hearing before an administrative law judge, Case sought: a 15% penalty on account of the alleged violation of safety regulations under the United States Occupational Safety & Health Act of 1970; nursing services and related expenses; reimbursement for travel expenses; the provision for special appliances and improvements to his home to facilitate his daily activities, an increase of compensation from $49 to $66.50 per week from the time of the second injury; reimbursement for expenses incurred in connection with acupuncture treatments; and attorney's fees on all such items, on the allegation that appellant had controverted all of them.

Upon appeal, the full commission held that:

Case was entitled to nursing services; his wife had adequately provided these services; Mrs. Case was entitled to compensation at the minimum wage rate for 24 hours a day, seven days a week from May 10, 1973 to May 15, 1974, except for a period of hospitalization; Case was entitled to continued nursing services by his wife for which she should be compensated at the minimum wage rate in Arkansas for 16 hours a day, seven days a week, beginning May 15, 1974, but that Case no longer needed nursing services for 24 hours per day; the hourly rate of compensation shall be increased as the minimum wage is increased; appellants should provide a whirlpool bath and seat and a lower extremity resistive exercise table and a hot water tank and housing adequate for the whirlpool equipment; appellants were liable for travel expenses between Case's home and the places he received medical treatment or physical therapy, except for a trip for acupuncture treatments; maximum attorney's fees were allowed upon controverted items.

Both parties appealed from the commission's decision, but it was affirmed by the circuit court. Both parties appeal from the judgment of the circuit court. Appellants rely upon the following points for reversal:

## I

A WORKMEN'S COMPENSATION CLAIMANT'S WIFE IS NOT ENTITLED TO BE COMPENSATED FOR ORDINARY SERVICES RENDERED HER INJURED HUSBAND AND THE COMMISSION'S AWARD OF REMUNERATION TO MRS. ARGUSS CASE WAS NOT JUSTIFIED BASED UPON THE EVIDENCE PRESENTED.

## II

THE COMMISSION'S FINDING THAT PORTIONS OF THE AWARD HAD BEEN

CONTROVERTED WAS NOT SUPPORTED BY
SUBSTANTIAL EVIDENCE.

I

Appellants state that, based upon the evidence, the award for Mrs. Case for nursing services is unreasonable and that this portion of the award should be remanded for further consideration or dismissed. We can find no basis for dismissal, and no necessity for remand.

Ark. Stat. Ann. § 81-1311 (Repl. 1976) requires that the employer provide nursing services for an injured employee. In *Sisk* v. *Philpott,* 244 Ark. 79, 423 S.W. 2d 871, we sustained the award of compensation for nursing care by a relative. In *Dresser Minerals* v. *Hunt,* 262 Ark. 280, 556 S.W. 2d 138, we approved an award for the nursing services of a wife. We do not agree with appellants' contention that Mrs. Case's entitlement to compensation for nursing services for caring for her injured husband, or the liberal allowance for the period between May 10, 1973 and May 15, 1974, was not supported by substantial evidence, but we do agree that the allowance of compensation for a wife taking care of her husband, on the basis of 16 hours per day, beginning May 15, 1974, is unreasonable and not supported by substantial evidence.

As a result of his injuries, Case suffered sphinctive difficulties. When he was released from the hospital on May 10, 1973, he was in full control braces. Although he was able to walk without the bracing, he could not do so effectively. A catheter had been removed only two days earlier, but he continued to be incontinent of feces, for sometime. He was required to continue physical therapy twice a week as an outpatient. He had a post-phlebetic syndrome with some swelling. He was able to walk on crutches to some extent, but a wheelchair was required when he tired. After he was released, he experienced a urinary infection. He was able to do without a catheter but experienced involuntary micturation, and his difficulty in voiding continued for quite a while.

Although 18 months is normally considered as the period of potential healing where spinal cord injuries are concerned, his neurological improvement after four months was

not satisfactory. Six months after the injury, he had no functional use of his legs from the knee down. There was weakness in his hips and he felt that the left hip socket tended to dislocate at times. Outpatient therapy with electric muscle stimulation two or three times per week was later prescribed. On November 1, 1973, when Case fell, he sustained a fracture of the left femoral neck. Surgery was required and when he was discharged from the hospital he was instructed in non-weight bearing, walker ambulation and wheelchair use. Resumption of physical therapy was recommended. There was some retrogression in respect to bladder function, because catherization was again required in this later hospitalization. He seemed to reach a plateau about the middle of January, 1974, and a return to use of surgical elastic hose was recommended because of numbness in his feet and increased edema in the lower left extremity.

Case was returned to the hospital for one week in January, 1974, because of acute thrombophlebitis in this leg. He was discharged on anticoagulants and medication for blood count. Physical therapy to strengthen the muscles of his lower extremity and back were continued. When examined in April, 1974, he reported that he was doing quite well, except for a popping sensation from the left hip, which was neither painful nor annoying, when he did situps with someone holding his legs. He reached the end of his healing period in May, 1974, with a permanent physical impairment of the body as a whole, amounting to 80% to 95%, with chronic thrombophlebitis of the left lower extremity which would, if anything, increase his impairment. By December 5, 1974, Case was able to walk with a waddling gait with motor paralysis primarily in the muscle of the thigh. He still wore braces on both lower extremities and was emptying his bladder by use of the Crede maneuver.

Prior to May 29, 1975, Case had undergone 47 acupuncture treatments in Washington, D.C., but his feeling of relative improvement thereafter could not be objectively substantiated. Thereafter, he received additional acupuncture treatments, which improved his confidence in his walking, but his neurosurgeon found no objective evidence of improvement in motor or sensory function. In March, 1976, Case was suffering itermittent pain in his left hip region. He continued

to have problems of urinary incontinence, but was free of infection. He required frequent changing of undergarments in much the same way one would care for a newborn infant. He was still wearing short leg braces in March, 1978, and walking on the inside of his foot.

Mrs. Case was given instructions on exercising her husband while he was in the hospital after he suffered the hip fracture. After 11 weeks in the hospital, Case could only sit up for short intervals and had to remain in bed and had to eat in bed part of the time. Mrs. Case had to help him turn over in bed every two hours for about two months. She had to bathe him, and remove and replace his full body brace at least twice a day. It was two or three months before he was able to leave the house and she stayed with him except for short periods when she did such things as grocery shopping. After his hip injury, he had to stay off his leg for 12 or 13 weeks. At the time of the hearing, he still had a problem with his bowels and bladder. He used a walker in the house, but used crutches when walking outside. After he walked a block, he had to stop and rest. He could bathe himself but his wife had to dry him afterwards. She drove the car when they went anywhere. He could go upstairs by use of a handrail, but since he needed someone behind him in case he fell because of poor balance, she followed him sometimes. He wears rubber pants, which he can remove, but she has to help him put them on. She still helps him with one of his exercises. Mrs. Case usually goes with him whenever he leaves home to help him through doors, but he walks in the yard alone. She was not administering any medicine, as he was not taking any. Her help was primarily in getting things for him and helping him get around.

He spent one month in Washington D.C., in April, 1975, taking acupuncture treatments. He returned home for a week and then went back for an additional month, for more treatment. Mrs. Case went with him on the first trip, but not the second. The first time she shopped for groceries and changed his bed if he had "accidents." The acupuncture center was in the motel where Case stayed and he was able to get along without his wife on the second trip. When he needed things away from the motel, either a bellboy or another patient got them for him. He is now able to walk around the house with

the aid of only one ordinary walking cane. Mrs. Case still helps Case get his clothes and, when he has an "accident" at night, she changes his bed and pajamas.

In the opinion of a physical therapist who worked with Case and who testified on his behalf on March 4, 1975, the claimant was then able to do his own preparation for bowel and bladder care and did not need someone in his presence in the house at all times. He said that when Case came out of the whirlpool bath, he could dry himself except for his ankles, feet and buttocks. He felt that Case could take care of himself after bowel and bladder accidents in his own home, with some degree of difficulty.

In approaching the question of substantiality of evidence, it is sometimes difficult to strike a balance between accepting any evidence as substantial evidence and weighing the evidence. "Any" evidence is not substantial evidence. *St. Louis S.W. Ry. Co.* v. *Braswell,* 198 Ark. 143, 127 S.W. 2d 637. Bare conclusions, without supporting facts, are not substantial evidence. *Arkansas State Highway Com'n.* v. *Carruthers,* 246 Ark. 1035, 441 S.W. 2d 84. Substantial evidence is valid, legal and persuasive evidence. *Arkansas Pollution Control Com'n.* v. *Coyne,* 252 Ark. 792, 481 S.W. 2d 322. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," as stated by the Court of Appeals for the Eighth Circuit. See *NLRB* v. *Arkansas Grain Corp.,* 392 F. 2d 161 (8 Cir., 1978). See also, *Easttam* v. *Secretary of Health, Education & Welfare,* 364 F. 2d 509 (8 Cir., 1966). Substantiality is a question of law. *Aluminum Co. of America* v. *McClendon,* 259 Ark. 675, 535 S.W. 2d 832. We addressed the matter of substantial evidence in that case, which was a worker's compensation case. There we said:

Substantial evidence has been defined as "evidence that is of sufficient force and character that it will, with reasonable and material certainty and precision, compel a conclusion one way or the other. It must force or induce the mind to pass beyond a suspicion or conjecture." Ford on Evidence, Vol. 4, § 549, page 2760.

Substantial evidence has also been defined as "evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences." Wigmore on Evidence, Vol. IX, 3rd ed § 2494, footnote at page 300. See also *Tigue* v. *Caddo Minerals Co.*, 253 Ark. 1140, 491 S.W. 2d 574; *Goza* v. *Central Ark. Dev. Council*, 254 Ark. 694, 496 S.W. 2d 388.

It may well be that there is some evidence that would tend to support the award made by the commission, particularly if the nursing services were not being rendered by the claimant's wife. We have recognized that a wife, under appropriate circumstances, should be compensated for such services rendered her husband, especially when she has found it necessary to leave her employment to do so. *Dresser Minerals* v. *Hunt*, 262 Ark. 280, 556 S.W. 2d 138. There is, without doubt, substantial evidence that Case needs some services and that it is advisable that someone be available 24 hours a day. The real issue is whether the evidence is substantial to support an award for nursing services by a spouse which covers 16 hours per day.

The nursing services for which the employer is responsible are those reasonably necessary for the treatment of the injury. Ark. Stat. Ann. § 81-1311 (Repl. 1976). This does not include those services which one spouse is normally expected to render to another. In *Dresser Minerals* v. *Hunt*, supra, we have given recognition to the fact that the term "nursing services" embraces more than a wife's ordinary care for a sick husband, and indicated that the services contemplated were those rendered in tending or ministering to another in sickness or infirmity. The problem lies in establishing a line of demarcation between the two types of services when both are rendered by one spouse to another.

Marriage is a civil contract between a husband and a wife. Ark. Stat. Ann. § 55-101 (Repl. 1971); *Meister* v. *Moore*, 96 U.S. 76, 24 L. Ed. 826 (1878); *Dodson* v. *State*, 61 Ark. 57, 31 S.W. 977; *Reaves* v. *Reaves*, 15 Okla. 240, 82 P. 490 (1905); *B* v. *B.*, 78 Misc. 2d 112, 355 N.Y.S. 2d 712 (1974). *Anonymous*

v. *Anonymous*, 67 Misc. 2d 982, 325 N.Y.S. 2d 499 (1971). See also, *Smiley* v. *Smiley*, 247 Ark. 933, 448 S.W. 2d 642; *Bickford* v. *Carden*, 215 Ark. 560, 221 S.W. 2d 421; *Worden* v. *Worden*, 231 Ark. 858, 333 S.W. 2d 494; *Shatford* v. *Shatford*, 214 Ark. 612, 217 S.W. 2d 917; *Pickston* v. *Daugherty*, 109 So. 2d 577, 71 ALR 2d 618 (Fla. App., 1959); *State ex rel Fowler* v. *Moore*, 46 Nev. 65, 207 Pac. 75, 22 ALR 1101 (1922); *State* v. *Bittick*, 103 Mo. 183, 11 LRA 587 (1891). The contract is to be husband and wife and to assume all rights and duties of the marital relationship. *Jambrone* v. *David*, 16 Ill. 2d 32, 156 N.E. 2d 569 (1959). The common understanding of marriage in this country is that the two parties to the contract have undertaken to establish a life together and assume certain duties and obligations to each other. *Lutwak* v. *U.S.*, 344 U.S. 604, 73 S. Ct. 481, 97 L. Ed. 593 (1953). See also, Black's Law Dictionary, DeLuxe 4th Ed. p. 1123; *B* v. *B*, supra; 55 CJS 806, Marriage, § 1. The marital obligation is a composite of many responsibilities and duties; it is the obligation of each spouse to the other to live conjugally, with the other, and to love, support, protect and defend the other. *Williams* v. *Williams*, 34 Ill. App. 2d 210, 181 N.E. 2d 182 (1962). A spouse is legally obligated to provide support to his spouse who is physically infirm. Ark. Stat. Ann. § 41-2405 (Repl. 1977). One spouse, by virtue of the marriage relation, has the right to the society, companionship, services, love, affection and aid of the other. *Gibson* v. *Gibson*, 244 Ark. 327, 424 S.W. 2d 871; *Little Rock Gas & Fuel Co.* v. *Coppedge*, 116 Ark. 334, 172 S.W. 885; *Billingsley* v. *St. Louis, I. M. & S. Ry. Co.*, 84 Ark. 617, 107 S.W. 173. See also, *Missouri Pac. Transportation Co.* v. *Miller*, 227 Ark. 351, 299 S.W. 2d 41; Ark. Stat. Ann. § 27-909 (Repl. 1962). It is the legal duty of the husband and wife to attend, protect and care for and nurse the other in sickness, when either is unable to care for himself. *Robinson* v. *Foust*, 31 Ind. App. 384, 68 N.E. 182 (1903); *Galway* v. *Doody Steel Erecting Co.*, 103 Conn. 431, 130 A. 705 (1925).

Obviously, some of the services performed by the claimant's wife are no more than should be expected because of the relationship. Appellee admitted that she was "married to the guy" and willing to do all she could to help him. Dividing the services between those the claimant had a right to expect from his wife, and those which are nursing services for which she should be compensated, is not an easy or simple

task. Professor Larson pointed up the problem. 2 Larson's Workmen's Compensation Law 10-469, § 61.13. He said:

> The commonest controversy is the question whether practical nursing services performed by the claimant's own wife may be made the subject of a claim for nursing expenses. The earlier cases denied the allowance, on the ground that the wife did no more than she was bound to do as an affectionate spouse. Later cases, however, have permitted the charge, on the reasoning that the employer, by statute, has the affirmative duty of furnishing this kind of nursing service. If he has not done so, and if the wife then takes over these duties in addition to her regular household work and does exactly what a hired nurse would have had to do, the charge is proper.

Nursing services do not include assistance with household and personal tasks which the claimant is unable to perform. To extend the meaning of the term to include such services would be judicial legislation. *Tirocchi* v. *United States Rubber Co.,* 101 R.I. 429, 224 A. 2d 387 (1966).

In *Graham* v. *City of Kosciusko,* 339 So. 2d 60 (Miss., 1976), the Mississippi Supreme Court grappled with the problem of compensating a wife for nursing services to her husband and concluded that required nursing services should be separated from general household duties and work that a wife ordinarily performs in and about the home in looking after and caring for her husband and family. The court pointedly observed that, while one paraplegic, for example, might leave home, drive himself to work, work all day, and drive himself home, without a moment's trouble, another might need constant care and attention.

Even when an employer was required to pay the cost of nursing services by an unlicensed practical nurse employed by a claimant, it was held that the employer was not required to assume full cost of the nurse's services, where her time was divided between nursing services and general housekeeping and the worker was able to dress himself, prepare and take his own medication, feed himself, and perform bathroom functions unassisted. *Pan American World Airways, Inc.* v.

*Weaver,* 226 So. 2d 801 (Fla., 1969). In that case, the nurse administered medicine to the claimant when he was unable to administer it to himself and assisted the claimant in bathing.

This case is unlike *Dresser Minerals* v. *Hunt,* 262 Ark. 280, 556 S.W. 2d 138, where only $100 per week was allowed to a wife who gave up regular employment, which paid her $100 per week, to give nursing services, consisting of giving intramuscular injections, enemas, hot baths, leg and back rubs, and other care that was necessary around the clock, seven days a week, to a husband who was both an invalid and an incompetent. Neither is this case like *Sisk* v. *Philpot,* 244 Ark. 79, 423 S.W. 2d 871, where there was an award of $500 per month to a father, who gave up regular employment at which he was earning in excess of $500 per month to care for a son who sustained a compensable injury which rendered him mentally incompetent and physically helpless, so that he required constant nursing attention 24 hours per day. In that case, a practical nurse who was being paid $900 per month for nursing services to the injured employee had quit because the work was too strenuous and no other person could be found who would be willing to accept employment to nurse the claimant.

Although leaving employment to care for a spouse (or relative) is not controlling, it is a relevant factor in such cases. 2 Larson, Workmen's Compensation Law 10-469 et seq., § 61.13. It was relevant in the *Sisk* and *Hunt* cases. It appears that, in this case, the wife's compensation would be more than double that awarded in the two cases above mentioned. The award here is certainly disproportionate for the nursing services required, to say the least.

There is one indisputable fact in this record that clearly shows that Arguss Case does not need nursing services 16 hours per day. When he made his second trip to Washington, D.C., for acupuncture treatments, he was completely without any such services and there is nothing in this record that shows that he did not fare as well as could be expected, considering his disability.

Case is able to walk with a walker or cane. He can dress

himself and put on his shoes. He can get in and out of an automobile unassisted. He could put his rubber pants on, if he had to. Although it seems that he does not do so, he can drive an automobile, without driving controls, using his short leg braces. He is able to prepare for his own bowel and bladder care. Mrs. Case does leave him alone when she goes to the grocery or "whatever she has to do." She cannot comfortably leave him at night, but there is no indication that she has to do anything at night, unless Case has an "accident" due to incontinence. The bladder problem seems to be persistent, but the more recent medical reports do not mention the bowel problem and Mrs. Case's testimony indicates that this may have been confined to a period of one year after the injury. The "accidents" sometimes occur nightly, but sometimes he goes a week without having one.

There are certain services performed by Mrs. Case which are compensable as nursing services when doubts are resolved in favor of the claimant. Assisting Case in doing some of his required exercises, helping him to put on rubber pants he wears because of urinary incontinence, changing his bed and pajamas when he has a urinary or bowel "accident" during the night, and, perhaps, helping him dry after a bath, are in that category. The constancy of her attendance upon her husband is obviously increased by the nature and extent of his physical disability. These services, over and above those she owed her husband as a part of her marital obligation, would not begin to consume 16 hours per day, even when allowances are made for the necessity for Mrs. Case's presence in order to perform them. There is simply no substantial evidence to support an award based on 16 hours per day when we test it on the basis of the appropriate standards. The administrative law judge, in a very liberal award, found a basis for allowance for nursing services by Mrs. Case on the basis of 10 hours per day. Even though we give the findings of the administrative law judge no weight, there is certainly no substantial evidence to justify an award in excess of that. Obviously, we find no merit in appellants' argument on cross-appeal that the commission erred in not awarding compensation for nursing services on a 24-hour basis.

We have affirmed the judgment of a circuit court modifying an award for permanent partial disability by reducing it

from 40% to the body as a whole to 20%, because there was no evidence to support an award for more than the reduced amount, fully recognizing that the determination of the degree of disability was a function of the Workmen's Compensation Commission. *Ray v. Shelnutt Nursing Home,* 246 Ark. 575, 439 S.W. 2d 41. We have also reversed the judgment of a circuit court affirming the commission's award of permanent partial disability of 30% and remanded the cause to the circuit court for remand to the commission for entry of an award of 10% disability, because we found no evidence to support an award in excess of that amount. *Diversa & Cotton Belt Ins. Co. v. Davis,* 257 Ark. 825, 520 S.W. 2d 243. We acted similarly in *Springdale Farms v. McGarrah,* 260 Ark. 483, 541 S.W. 2d 928. On the other hand, in *Aluminum Co. of America v. McClendon,* supra, we found no substantial evidence to support an award of total permanent disability and remanded the case for further proceedings by the commission on the question of the extent of the disability. In this case, we choose to follow the precedent established in *Ray v. Shelnutt Nursing Homes, Diversa & Cotton Belt Ins. Co. v. Davis,* and *Springdale Farms v. McGarrah,* by modifying the award for nursing services to allow compensation of Mrs. Case on the basis of 10 hours per day.

## II

Appellants base their contention that portions of the award were not controverted upon assertions that they never denied liability on the claim or any of appellee's entitlements under the Worker's Compensation Law and that the carrier was making payments and providing prosthetic devices, wheelchairs, ramps, crutches, braces, etc., prior to April 10, 1973, the date appellee retained his attorney. Appellants contend that they denied liability only when the claimant demanded a 15% penalty and payment of his expenses for acupuncture treatments. The commission found that appellants had controverted: claims for reimbursement for mileage to and from his physicians, and to and from sessions of physical therapy and rehabilitation; the provision of necessary additional equipment proposed by a physical therapist and Dr. Jim Moore, a neurological surgeon; two Homedic bills; a bill from Dr. Moore; nursing care by the claimant's wife; and payment of court reporter's fees for the

deposition of Robbie Walker, a physical therapist.

Appellants contend that, while the question whether a claim is controverted is one of fact, not to be determined mechanically, failure or mere delay in payment when the carrier has accepted the claim as compensable is not equivalent to controversion, citing *Horseshoe Bend Builders* v. *Sosa*, 259 Ark. 267, 532 S.W. 2d 182; *International Paper Co.* v. *Remley*, 256 Ark. 7, 505 S.W. 2d 219; *Garner* v. *American Can Co.*, 246 Ark. 746, 440 S.W. 2d 210. Appellants then refer us to that portion of Ark. Stat. Ann. § 81-1311 which provides:

> If the employer fails to provide the services or things mentioned in the foregoing sentence within a reasonable time after knowledge of the injury, the Commission may direct that the injured employee obtain such service or thing at the expense of the employer, and any emergency treatment afforded the injured employee shall be at the expense of the employer.

The question before us is whether there is any substantial evidence to support the commission's findings in respect to controversion. *International Paper Co.* v. *Remley*, supra. The question of controversion of nursing services hardly merits discussion. Bill Stackhouse, an adjuster for St. Paul Insurance Company, testified that there was a letter in the company's file in this case giving notice that Case was claiming nursing expense. Stackhouse was given the opportunity to talk with Mrs. Case. Thereafter, the company sent one check for $198, which he said was for extra work. He did not consider this as payment for nursing services, because Mrs. Case was the claimant's wife and was not a nurse. He calculated the payment at common labor rates for four hours per day. The time per day was a matter of opinion based on his own feeling, in an effort to arrive at some reasonable compensation to her for services attributable to Case's fall at the rehabilitation center. Stackhouse considered that only the assistance she rendered Case after that incident was beyond what should be expected of her as his wife. No further payments were made. This item was clearly controverted.

Appellants next assert that the furnishing of a stationary arm, leg and hip whirlpool, a stainless steel seat for it and a

resistive exercise unit recommended for Case by Robbie L. Walker, a physical therapist, was not controverted because the carrier agreed to pay for them, but did not procure them, because it assumed that Case would arrange for delivery and present the bill, as he had done in connection with other items. Appellants contend no bill or claim was ever presented to the carrier for payment. From the file of the commission in this record, it appears that appellee's attorney sent Walker's letter recommending this equipment to the attorney then representing the carrier, accompanied by photostatic copies of pictures of the equipment, with figures of $920, $45 and $275, noted beside the respective pieces. The file also discloses that on April 18, 1975, the carrier had advised the attorney then representing it that it agreed to pay for the equipment and listed the items described in the pictures, quoting prices corresponding to the figures shown on the photostatic copy. It also reveals that on April 25, 1975, the carrier's present attorney advised appellee's attorney that the company would not *furnish* the devices unless they were prescribed by the claimant's attending physician. Another letter in the commission file was written by appellee's attorney to appellant's present attorney on August 19, 1975, enclosing a letter from Dr. Jim J. Moore, bearing a July, 1975, date, which stated he had reviewed Walker's recommendations and concurred that such apparatus would be beneficial to the patient both to strengthen and to maintain whatever function was present, and to allow Case to do a great deal of physical therapy at home without incurring travel cost in going to the physical therapist. In Case's deposition, taken December 30, 1975, he stated that appellants had not paid for the exercise equipment. Although appellants' attorney then exclaimed that "We've furnished every bit of that," the opinion of the Workmen's Compensation Commission was not filed until July 13, 1977, and it recited that appellants had failed to furnish this equipment and included it in the award made. There was substantial evidence of controversion of this part of the claim.

Appellants also state that the carrier had paid all requests for reimbursement for mileage as well as all medical benefits. It would unduly extend this lengthy opinion to detail the facts indicating that the carrier was rather dilatory about these payments. Appellants' adjuster admitted that for

eight months after receiving some of the information on these items of expense, he did nothing. We consider the evidence of controversion substantial.

Appellants cite no authority and present no convincing argument on any other items which the commission held to have been controverted, so we do not consider them. *Dixon* v. *State*, 260 Ark. 857, 545 S.W. 2d 606.

Appellee contends that the commission erred in failing to find that the entire claim was controverted. We find no basis for reversing the commission's action in that respect.

We find it unnecessary to treat appellants' points III and IV, because they are responsive to questions raised on appellee's cross-appeal, which have been specifically abandoned by appellee in his brief.

The judgment is affirmed on cross-appeal. The judgment is affirmed as modified on direct appeal. The cause is remanded to the trial court with directions to the trial court to remand it to the Workmen's Compensation Commission for entry of an award consistent with this opinion.

HICKMAN, J., dissents as to the modification.